**SIERRA CLUB, a nonprofit corporation, Plaintiff,**

v.

**COLORADO REFINING COMPANY, a Colorado Corporation, Defendant.**

**Civ. A. No. 93–K–1713.**

United States District Court,
D. Colorado.

Dec. 8, 1993.

Reed Zars, Denver, CO, for plaintiff.

Daniel Patterson, Holland & Hart, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

This case is before me on a motion to dismiss filed by defendant Colorado Refining Company ("CRC"). Plaintiff Sierra Club asserts three causes of action. The first is for unpermitted discharges into Sand Creek in violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311(a) (1986); the second for discharges to Sand Creek in violation of CRC's National Pollution Discharge Elimination System ("NPDES") Permits and the

Clean Water Act, and the third for failure to determine the impact to Sand Creek of its noncomplying discharges in violation of the Clean Water Act. CRC moves to dismiss Sierra Club's first cause of action for lack of subject matter jurisdiction under Fed. R.Civ.P. 12(b)(1) and for failure to state a claim under Rule 12(b)(6) and to dismiss partially the second cause of action under Rule 12(b)(6) to the extent that the claim requests civil penalties for pre-April 1992 permit violations.

## I. Facts and Procedural Background

This complaint was filed on August 12, 1993. No trial date has yet been set. Sierra Club brings this "citizen suit" pursuant to 33 U.S.C. § 1365(a)(1)(A)[1] and 28 U.S.C. § 1331[2], alleging that CRC has illegally discharged pollutants, in excess of permit limits, into Sand Creek from its refinery located in Adams County, Colorado, immediately to the south of the creek. Sierra Club further alleges that such discharge has and continues to degrade the water quality of Sand Creek and to diminish the fish populations downstream from the refinery.

It is undisputed that in April 1989, the Colorado Department of Health ("CDH") issued a Notice of Violation to CRC regarding NPDES effluent limit exceedances[3] between November 1988 and February 1989. In June 1989, CDH issued an Amended Notice of Violation to CRC regarding NPDES Total Suspended Solids exceedances from December 1988 through December 1989. In July 1992, CRC entered into an Agreement and Stipulated Order ("the stipulated order") with CDC regarding the aforementioned exceedances and additional exceedances which occurred through April 1992. In compliance with the penalty agreement, CRC paid penalties of $20,000 and waived its right to appeal in final settlement of any claims for penalties for exceedances which might be sought through April 1992.

## II. Standard for Motion to Dismiss

Under Fed.R.Civ.P. 8(a), a plaintiff is required to offer a short and plain statement (1) of the grounds upon which the court's jurisdiction depends and (2) of the claim showing that the pleader is entitled to relief. In ruling on a motion to dismiss, whether on the ground of lack of jurisdiction over subject matter under Rule 12(b)(1) or for failure to state a cause of action under Rule 12(b)(6), the court must accept all factual allegations as true and must draw all reasonable inferences in favor of the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). A claim should not be dismissed under Rule 12(b)(1) unless it appears beyond doubt that

---

**1.** This section provides in pertinent part:

> Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—
> (1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter ...

> The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation ... and to apply any appropriate civil penalties under section 1319(d) of this title.

In addition, 33 U.S.C. § 1319(d) provides in pertinent part:

> Any person who violates section 1311, 1312, 1316, 1317, 1318, 1328, or 1345 of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator, or by a State, or in a permit issued under Section 1344 of this title by a State, ... shall be subject to a civil penalty not to exceed $10,000 per day of such violation.

**2.** This section provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treatises of the United States."

**3.** I am reluctant to call "exceedance" a word at all. To use it invokes images of reverse peristalsis. Webster's International and the O.E.D. are predictably and mercifully silent in the matter. I don't know why a perfectly legitimate word such as "excess" cannot be used nor why a counterfeit flummery such as "exceedance" is coined. Nevertheless, the Congress of the United States has seen fit to use it in a statute (The Clean Air Act, see e.g. 42 U.S.C. §§ 7412(m)(5)(D), 7429(c), 7502(a)(2)(C)(ii)) and the briefs of the environmentalist cognoscenti are replete with its borborygmic ditter; it has even invaded the text of otherwise intelligent judicial opinions. If then, such is what litigants are disputing and Congress is legislating, I will use "exceedance(s)" in the faint hope that it conveys some meaning to anyone who might be interested. The disinterested reader, however, will need the assistance of this prolix footnote.

plaintiff can prove no set of facts which would entitle him to relief. *Id.; Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984). All of the plaintiff's pleadings must be liberally construed. *Swanson,* 750 F.2d at 813.

### III. *First Cause of Action for Violation of the Clean Water Act*

The Clean Water Act provides that "[e]xcept as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). The term "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source.... " *Id.* § 1362(12). "Point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, ... from which pollutants may be discharged.... " *Id.* § 1362(14). For the purpose of the Clean Water Act, the term "navigable waters" has been defined broadly as "the waters of the United States, including the territorial seas." *Id.* § 1362(7). Federal Courts have interpreted this directive broadly to include waters tributary to those which are navigable in fact. *Quivira Mining Co. v. United States EPA,* 765 F.2d 126, 129 (10th Cir.1985).

CRC argues that while the term "navigable waters" is construed broadly, Congress did not intend to include groundwater within its definition. CRC maintains that certain allegations in the complaint indicate that Sierra Club's first cause of action is totally founded on the discharge of pollutants by CRC into the soil and groundwater which then make their way into Sand Creek.

### A. *Rule 12(b)(1) Challenge*

CRC argues that, since the Clean Water Act does not regulate the discharge of pollutants into groundwater, this court lacks subject matter jurisdiction over the first cause of action and that it fails to state a claim upon which relief may be granted. CRC relies on *United States v. GAF Corp.,* 389 F.Supp. 1379, 1381 n. 2 (S.D.Tex.1975). *GAF,* however er stated that the interweaving of jurisdictional and substantive provisions of the Clean Water Act "has the effect of equating, *at least in this case,* a failure to state a claim with a lack of subject matter jurisdiction." *Id.* (emphasis added). The facts and jurisdictional allegations of *GAF* are distinguishable from those before me. There plaintiff's sole jurisdictional ground was 33 U.S.C. § 1319(b). Under that section, the Administrator of the Environmental Protection Agency ("EPA") is authorized to commence a civil action in federal court where the Administrator has previously found a violation under the Clean Water Act. Here, Sierra Club invokes jurisdiction for its "citizen suit" under 33 U.S.C. § 1365(a)(1)(A) which does not require a separate finding by the Administrator of the EPA before jurisdiction attaches. Therefore, the *GAF* equation of a failure to state a claim with a lack of subject matter jurisdiction is inapposite in this case.

More relevant to the jurisdictional inquiry is the Supreme Court's holding that the assertion of a claim under a federal statute "alone is sufficient to empower the District Court to assume jurisdiction over the case and determine whether, in fact, the [statute] does provide the claimed rights." *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 359, 79 S.Ct. 468, 473, 3 L.Ed.2d 368 (1959). Sierra Club alleges in support of its first cause of action that CRC is violating the Clean Water Act by discharging pollutants without a permit. Sierra Club has, therefore, asserted a claim under the Clean Water Act, 33 U.S.C. § 1365(a) which gives the district courts jurisdiction "to enforce ... an effluent standard or limitation ... and to apply any appropriate civil penalties." Section 1365(f) defines "effluent standard or limitation" to include an unlawful act under § 1311(a) which prohibits "the discharge of any pollutant" without a federal or state permit or in violation of the conditions of such permit. Thus, applying *Romero,* this court has jurisdiction over the first cause of action.

Sierra Club additionally invokes jurisdiction under 28 U.S.C. § 1331, which vests the district courts with original jurisdiction "over all civil actions arising under the Constitution, laws, or treaties of the United States."

Clearly, the first cause of action raises a federal question by alleging a violation of the Clean Water Act, a law of the United States.

For the reasons stated above, I deny CRC's motion to dismiss the first cause of action under Rule 12(b)(1) for lack of subject matter jurisdiction.

## B. *Rule 12(b)(6) Challenge*

CRC maintains that, even accepting the allegations of the first cause of action as true, Sierra Club fails to state a claim upon which relief may be granted since the Clean Water Act does not regulate the discharge of pollutants into groundwater, even though such pollutants then migrate through the ground water into surface water which is subject to the Act. CRC points to certain allegations in the complaint which, it argues, indicate that the first cause of action is solely based on the contamination of groundwater which then enters Sand Creek. These include the allegations that "[a]s a result of oilspills, pipeline and tank leaks, and other releases at the refinery site, large quantities of petroleum and related compounds have entered, and continue to enter, the soils and groundwater beneath the refinery," (Compl. ¶¶ 11, 25, 26,) and that "[p]etroleum products and related compounds released in this manner are discharged with the groundwater into Sand Creek" through "underground paleochannels" and "seeps in the bank of the creek," (*Id.* ¶¶ 11, 27, 28). Sierra Club responds that the "complaint alleges in at least 25 separate paragraphs that defendant's pollutants are being discharged directly into Sand Creek," (Sierra Club's Opp'n. to Def's. Mot. to Dismiss at 10) and, that since Sand Creek is a tributary of the South Platte River, it is a "navigable water" within the meaning of the Clean Water Act.

While the complaint contains numerous allegations that CRC has discharged and continues to discharge petroleum products and related compounds from the refinery site into Sand Creek, it is unclear, however, whether Sierra Club is alleging that any of such discharges were made directly from the refinery into Sand Creek, as opposed to through the soil and groundwater. It is certain, however, that Sierra Club bases its first cause of action, at least in part, on discharges which reach Sand Creek through groundwater beneath the refinery. Therefore, I must decide whether the Clean Water Act's prohibition of the discharge of any pollutant into "navigable waters" encompasses discharges which reach "navigable waters" through groundwater.

A review of the case law addressing the regulation of groundwater under the Clean Water Act reveals that "isolated/nontributary groundwater," such as confined wells, has been unequivocally excluded from the Act by some courts. However, these cases and others do not preclude the act from applying to the regulation of "tributary groundwater," such as in the present case, which migrate from groundwater back into surface waters.

CRC relies on *Exxon Corp. v. Train*, 554 F.2d 1310, 1329 (5th Cir.1977) in support of its contention that the Clean Water Act does not require permits for discharges into groundwater. However, the *Exxon* court expressly limited its holding to nontributary groundwater:

> Specifically, EPA has not argued that the wastes disposed of into wells here do, or might, "migrate" from groundwaters back into surface waters that concededly are within its regulatory jurisdiction.... We mean to express no opinion on what the result would be if that were the state of facts.

*Id.* at 1312 n. 1. CRC also relies on *GAF.* The court in *GAF,* however, held that "[t]he disposal of chemical wastes into the underground waters *which have not been alleged to flow into or otherwise affect surface waters* does not constitute a 'discharge of a pollutant' within the meaning of § 1311(a)." 389 F.Supp. at 1383 (emphasis added). Furthermore, in *United States Steel Corp. v. Train*, 556 F.2d 822 (7th Cir.1977), the court highlighted the distinction between "tributary" and "nontributary" groundwater. Interpreting the Clean Water Act, it held that the EPA is authorized "to regulate the disposal of pollutants into deep wells, at least when the regulation is undertaken in conjunction with limitations on the permittee's discharges into surface waters." *Id.* at 852.

Only a few courts have confronted the precise question of whether tributary groundwater is subject to regulation under the Clean Water Act. In *Kelley v. United States*, No. 79–10199 (E.D.Mich. Oct. 28, 1980) ("*Kelley I*"), an unpublished opinion, the Attorney General of Michigan brought a citizen suit under the Clean Water Act against the United States, alleging the leakage of a toxic chemical into groundwater, which the federal government acknowledged travelled to a navigable lake. The court rejected the federal government's argument that *Exxon* excluded groundwater from regulation under the Clean Water Act, explaining that the Fifth Circuit in *Exxon* "concede[d] that wastes which migrate from groundwaters back into surface waters are within the EPA's regulatory jurisdiction." *Kelley ex rel. People of State of Michigan v. United States*, 618 F.Supp. 1103, 1106 (W.D.Michigan 1985) ("*Kelley II*") (citing *Kelley* I, slip op. at 2–3). By contrast, however *Kelley* II reached the opposite conclusion. There, toxic chemicals were allegedly released into the ground at a Coast Guard station. The pollutants contaminated the groundwater under the station, and the plume of contamination was migrating downgradient, eventually discharging into the East Arm of Grand Traverse Bay. The court held that the Clean Water Act did not extend federal authority to the regulation of groundwater contamination. *Id.* at 1107. It relied considerably on the opinion in *Exxon*, despite that court's distinction between tributary and nontributary groundwater.

To the contrary, the court in *McClellan Ecological Seepage Situation v. Weinberger*, 707 F.Supp. 1182 (E.D.Cal.1988), after reviewing the authorities including *Kelley* II, concluded that groundwater would fall within the regulatory purview of the Clean Water Act if it were established that such groundwater was "naturally connected to surface waters that constitute 'navigable waters' under the Clean Water Act." *Id.* at 1196. Likewise, in *New York v. United States*, 620 F.Supp. 374 (E.D.N.Y.1985) the court apparently assumed the applicability of the Clean Water Act to tributary groundwater. "We decline to reach defendants' argument as to the scope of section 301 [of the Federal Water Pollution Control Act, the equivalent of § 1311 of the Clean Water Act] as applied to groundwaters, since it is clear that plaintiff has alleged that the pollutants threaten to contaminate [named creeks], all of which are undisputably navigable waters." *Id.* at 381. More tentatively, the court in *Inland Steel Co. v. EPA* acknowledged that "the legal concept of navigable waters might include ground waters connected to surface waters—though whether it does or not is an unresolved question." 901 F.2d 1419, 1422 (7th Cir.1990).

On the other hand, the court in *Town of Norfolk v. United States Army Corps of Engineers*, while acknowledging differences in the opinions of various courts as to whether groundwater constitutes "waters of the United States" within the meaning of the Clean Water Act, held that deference should be given to the Corps' interpretation which limited the definition only to surface waters. 968 F.2d 1438, 1451 (1st Cir.1992).

In sum, case law conflicts as to whether "navigable waters" in the Clean Water Act encompass groundwater. Although there is little direct Tenth Circuit authority in this regard, the Sierra Club has cited two opinions which indicate that that circuit has placed a broad interpretation on the scope of the Clean Water Act. In *United States v. Earth Sciences, Inc.*, the court ruled that unpermitted leach mining waste escaping into the Rito Seco Creek through overflow of a reserve sump and through groundwater seeps violated the Clean Water Act which "was designed to regulate to the fullest extent possible those sources emitting pollution into rivers, streams and lakes." 599 F.2d 368, 373 (10th Cir.1979). Although the court was chiefly addressing the issue of whether "navigable waters" include waters such as the Rito Seco Creek, which are not navigable in fact, the observations made are nevertheless pertinent. As the court in *Earth Sciences* noted, "[i]t seems clear Congress intended to regulate discharges into every creek, stream, river or body of water that in any way may affect interstate commerce. Every court to discuss the issue has used a commerce power approach and agreed upon that interpretation." *Id.* at 375.

**1434**

Likewise, in *Quivira*, 765 F.2d at 130, the court held that EPA had the authority under the Clean Water Act to issue NPDES permits regulating uranium mining company discharges into normally dry arroyos in New Mexico. The court reasoned that, although the arroyos were not navigable in fact, "surface flow occasionally occurs, at times of heavy rainfall, providing a surface connection with navigable waters independent of the underground flow. Additionally, the waters of the [arroyos] soak into the earth's surface, become part of the underground aquifers, and after a lengthy period, perhaps centuries, the underground water moves toward eventual discharge at Horace Springs or the Rio San Jose." *Id.* at 129. The *Quivira* court repeatedly stressed that "it was the clear intent of Congress to regulate waters of the United States to the fullest extent possible." *Id.* at 130.

■ These decisions leave little doubt that the Tenth Circuit has chosen to interpret the terminology of the Clean Water Act broadly to give full effect to Congress' declared goal and policy "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).[4] With this in mind, I conclude that the Clean Water Act's preclusion of the discharge of any pollutant into "navigable waters" includes such discharge which reaches "navigable waters" through groundwater. I therefore find that Sierra Club's allegations that CRC has and continues to discharge pollutants into the soils and groundwater beneath the refinery which then make their way to Sand Creek through the groundwater state a cause of action under the Clean Water Act. Accordingly, I deny CRC's Rule 12(b)(6) motion to dismiss the first cause of action.

## IV. *Second Cause of Action for Violation of NPDES Permits*

CDC argues that the second cause of action for violation of NPDES permits is jurisdictionally barred insofar as it seeks civil penalty relief for exceedances which occurred through April 1992. It is CDC's position that CDH's imposition of penalties with respect to such exceedances precludes Sierra Club's attempt to sue for the same underlying violations. CRC relies on the Clean Water Act's provision that:

[A]ny violation—

. . . .

(iii) for which . . . the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection or a comparable State Law, as the case may be,

shall not be the subject of a [citizen action for civil penalties].

33 U.S.C. § 1319(g)(6)(A)(iii).

Sierra Club argues that the stipulated order was not commenced, prosecuted or issued pursuant to a state law that is "comparable" to the administrative penalty provisions of the Clean Water Act as required by the above provision. Therefore, Sierra Club asserts that it is not precluded from seeking further civil penalties to remedy the NPDES permit violations purportedly covered by the stipulated order.

There is no question that the stipulated order constitutes "a final order not subject to judicial review" issued by the State of Colorado and that CRC has paid an assessed penalty. The issue before me is whether the stipulated order was issued and the penalty was assessed under "comparable State law" within the meaning of this provision.

Sierra Club contends that Colorado law is not comparable because, unlike the Clean Water Act, it does not require public notice of enforcement proceedings, does not require an opportunity for public comment or provide participation rights to concerned citizens, and does not describe any factors to be considered in determining the appropriate penalty.

---

4. CRC argues that the legislative history of the Clean Water Act precludes the application of the Act to groundwater. Other commentators, who have conducted an in depth examination in this regard, do not agree that this legislative history is conclusive. *See* Mary C. Wood, *Regulating Discharges into Groundwater: The Crucial Link in Pollution Control under the Clean Water Act,* 12 Harv.Envtl.L.Rev. 569 (1988).

CRC responds that the Colorado Water Quality Control Act, Colo.Rev.Stat. § 25–8–302(1)(e) (1989)[5] and its implementing regulations 5 Colo.Code Regs. 1002–1 § 2.1.4(C)(1), (2) (1988)[6] mandated public notice of the state action taken against CRC. CRC states that notification that the State of Colorado had issued the Notice of Violation and Cease and Desist order to CRC on April 26, 1989 was given to recipients of a publication entitled "Water Quality Information" in June, 1989. CRC points out that the Sierra Club has been on the mailing list for the publication at all relevant times. · Sierra Club does not allege that it did not receive this information.

Sierra Club counters that the Colorado Water Quality Control Act and related regulations do not require prior notice of, or meaningful opportunity to comment on, state penalty assessments in any way comparable to the relevant provisions of the Clean Water Act contained in 33 U.S.C. § 1319(g)(4)(A) (requiring the Administrator or Secretary to provide public notice of and reasonable opportunity to comment on proposed issuance of order.) CRC points out, however, that the Act does not require a public hearing to be conducted either before or after the issuance of a final order and that an interested party may only seek a hearing before the administrator if he/she took advantage of his/her opportunity to comment prior to the order. *See* 33 U.S.C. § 1319(g)(4)(B) and (C). Moreover, 33 U.S.C. § 1319(g)(8) provides for judicial review of a penalty assessment only at the instance of a person against whom the penalty was assessed or one who commented on the proposed assessment under 33 § 1319(g)(8).[7] Colorado law, on the other hand, allows "any person directly affected" by a final order to apply for a hearing or reconsideration of such order without the requirement of prior comment or receipt of notice under the implementing regulations. *See* Colo.Rev.Stat. § 25–8–403 ("During the time permitted for seeking judicial review of a final order ... any party directly affected by such order ... may apply ... for a hearing or rehearing with respect to ... such order....") Similarly, Colorado law allows judicial review of "any final order" by "any person adversely affected or aggrieved." *See* Colo.Rev.Stat. § 25–8–404(1) ("Any final rule, order, or determination ... shall be subject to judicial review in accordance with the provisions of this article and article 4 of title 24, C.R.S."); *Id.* § 24–4–106(4) ("any person adversely affected or aggrieved by any agency action may commence an action for judicial review in the district court within thirty days after such agency action becomes effective ...")

■ The term "comparable State law" as used in the Act does not mean that the state's regulatory authority or processes must be identical to the federal provisions. *Saboe v. State of Oregon*, 819 F.Supp. 914, 917 (D.Or.1993); *see also Sierra Club v. Port of Townsend Paper Corp.*, No. C87–316C, 1988 WL 160580, at *5–6 (W.D.Wash. May 2, 1988). A review of the administrative enforcement procedures under Colorado law and federal law reveals that, although the Colorado regulatory scheme does not mandate prior public notice of enforcement proceedings, overall, the scheme adequately protects the public interest in enforcement actions. *See North and South Rivers Water-*

---

**5.** This section provides in pertinent part: "The [water quality control] division shall: ... (e) Maintain a mailing list of persons requesting notice of actions by the division ... and notify persons on the list of such actions ..."

**6.** These regulations provide in pertinent part:
*Notice*
1) All formal adjudicatory hearings of the [water quality control] Commission and the [water quality control] Division shall be preceded by written notice thereof in accordance with the requirements of this section.
2) Any person entitled to notice of a hearing, including the petitioners, those persons on the mailing list maintained by the [water quality control] Division pursuant to C.R.S., 25–8–302(1)(e), and any person requesting notice as to a particular matter, shall be given timely notice of the time, place, nature of the hearing, the legal authority and jurisdiction under which it is to be held, and the matters of fact and law asserted.

**7.** This section provides in pertinent part: "Any person against whom a civil penalty is assessed under this subsection or who commented on the proposed assessment of such penalty in accordance with paragraph (4) may obtain review of such assessment ..."

shed *Ass'n, Inc. v. Scituate,* 949 F.2d 552, 556 n. 7 (1st Cir.1991.) (Construing similar state statutory scheme.)

It cannot be ignored that Sierra Club apparently received word of the Notice of Violation issued by the Colorado Department of Health to CRC in April 1989 and failed to take appropriate steps to voice its opinion. Furthermore, after the CRC entered the stipulated order in July 1992, Sierra Club did not avail itself of the relevant provisions of Colorado law to challenge such final order.

> [T]he citizen suit is meant to supplement rather than to supplant governmental action. The legislative history of the Act reinforces this view of the role of the citizen suit. The Senate Report noted that "[t]he Committee intends the great volume of enforcement actions [to] be brought by the State," and that citizen suits are proper only "if the Federal, State and local agencies fail to exercise their enforcement responsibility."

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 60, 108 S.Ct. 376, 383, 98 L.Ed.2d 306 (1987) (citing S.Rep. No. 92–414, p. 64 (1971), reprinted in 2 A Legislative History of the Water Pollution Control Act Amendments of 1972, p. 1482 (1973)). To allow Sierra Club subsequently to voice its dissatisfaction with the stipulated order by resorting to a citizen suit under federal law would negate the Colorado law safeguards and would supplant rather than supplement the governmental action. This is contrary to the purpose of a citizen suit. *Id.*

Sierra Club further argues that the penalty against CRC was not assessed under comparable state law since Colorado law, unlike the Clean Water Act,[8] does not describe any factors to be considered in determining the appropriate penalty. CRC maintains, however, that Colorado has a policy for the assessment of civil penalties contained in published guidelines adopted in 1984 and titled "Guidance for Assessing Civil Penalties."[9] CRC attaches a copy of the guidelines (Def's.Ex. 2) which require that, in the assessment of civil penalties, consideration be taken of factors closely similar to those mandated by the Clean Water Act. Sierra Club asserts that said guidelines do not constitute enforceable law.[10] Further, that taking into account the number of violations addressed by the stipulated order, it is apparent that the guidelines were not followed in assessing the penalty amount of $20,000.

As discussed above, citizen suits are proper only where a governmental agency has failed to exercise its enforcement responsibility. *Gwaltney,* 484 U.S. at 62, 108 S.Ct. at 383. Sierra Club attempts to balkanize the applicable Colorado law and fails to recognize that, taken as a whole, Colorado law contains "an adequate mechanism for assessing civil penalties against polluters." *North and South Rivers Watershed Ass'n. Inc.,* 949 F.2d at 559 (Selya, J. concurring). Sierra Club's dissatisfaction with the amount of the civil penalty assessed under Colorado law does not prove otherwise. Again, Sierra Club did not exercise its rights under Colorado law to challenge the stipulated order. It cannot now seek, by way of a federal citizen suit, to supplant the safeguard mechanisms contained within the relevant state law.

For the aforesaid reasons, I find that the stipulated order was issued and the penalty was assessed under "comparable State law" within the meaning of the Clean Water Act. I therefore grant CRC's motion to dismiss partially the second cause of action under

---

8. The Act provides that:

In determining the amount of any penalty assessed under this subsection, the Administrator ... shall take into account the nature, circumstances, extent and gravity of the violation, or violations, and, with respect to the violator, ability to pay, any prior history of such violations, the degree of culpability, economic benefit or savings (if any) resulting from the violation, and such other matters as justice may require.

33 U.S.C. § 1319(g)(3).

9. The "Guidance for Assessing Civil Penalties" was superseded on May 1, 1993 by the Water Quality Control Division's "Civil Penalty Policy."

10. Sierra Club argues that CDH's "Guidance for Assessing Civil Penalties" was not published pursuant to the State Administrative Procedure Act of Colorado which provides: "No rule shall be relied upon or cited against any person unless, if adopted after May 1, 1959, it has been published and ... has been made available to the public in accordance with this section." Colo.Rev.Stat. § 24–4–103(10) (1989).

Rule 12(b)(6) to the extent that such claim seeks civil penalties for those pre-April 1992 NPDES permit violations covered by the stipulated order. Accordingly,

IT IS ORDERED THAT CRC's motion to dismiss Sierra Club's first cause of action is DENIED;

IT IS FURTHER ORDERED THAT CRC's motion to dismiss partially Sierra Club's second cause of Action to the extent that such claim seeks civil penalties for those pre-April 1992 NPDES permit violations covered by the stipulated order is GRANTED.