**SIERRA CLUB, a nonprofit corporation, Plaintiff,**

v.

**COLORADO REFINING COMPANY, a Colorado corporation, Defendant.**

No. Civ. A. No. 93–K–1713.

United States District Court, D. Colorado.

May 17, 1994.

Reed Zars, Denver, CO, for plaintiff.

Daniel Patterson, Charles D. Henson, Holland & Hart, Denver, CO, for defendant.

## ORDER RE MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO AMEND

KANE, Senior District Judge.

This case is before me on Defendant Colorado Refining Co.'s ("CRC's") motion for summary judgment on Plaintiff Sierra Club's three remaining claims for relief and Sierra Club's motion for partial summary judgment relating to its first cause of action and motion to amend its complaint. I grant CRC's motion for summary judgment and deny Sierra Club's motions as moot.

### I. *Facts and Procedural Background*

Sierra Club brings this "citizen suit" pursuant to 33 U.S.C. § 1365(a)(1)(A) and 28 U.S.C. § 1331, alleging three causes of action. The first is for unpermitted discharges into Sand Creek from CRC's refinery immediately to the south of the creek in violation of Section 301 of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a); the second for discharges to Sand Creek in violation of CRC's National Pollution Discharge Elimination System ("NPDES") permit and the CWA;[1] and the third for failure to determine the impact to Sand Creek of CRC's noncomplying discharges.

### A. *CRC's NPDES Permit.*

In May 1987, CRC purchased the refinery from Asamera Oil (U.S.), Inc. ("Asamera"). The Water Quality Control Division ("WQCD") of the Colorado Department of Health ("CDH") issued to CRC a NPDES permit, number CO–0001210, effective December 1, 1992. (Def.'s Mot.Summ.J., Ex. A.) The NPDES permit was issued pursuant to the provisions of the Colorado Water

---

1. In my order dated December 8, 1993, I granted CRC's motion to dismiss in part Sierra Club's second cause of action, to the extent that it seeks civil penalties for those pre-April 1992 NPDES permit violations covered by the Agreement and Stipulated Order entered into between CRC and the Colorado Department of Health in July 1992. *See Sierra Club v. Colorado Refining Co.,* 838 F.Supp. 1428, 1437 (D.Colo.1993).

Quality Control Act ("CWQCA"), as amended, Colo.Rev.Stat. § 25–8–101 to 25–8–703 (1989), and the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251 to § 1387. The permit authorizes CRC to discharge wastewater from outfall number 001, the only outfall from which CRC discharges wastewater directly into Sand Creek. The permit sets limits on the amounts of substances which CRC may discharge through outfall 001. These limits are in accordance with standards set under the CWA and CWQCA. The permit also establishes guidelines for sampling the discharge from the outfall to assure compliance with the permit. The permit requires CRC to submit test results of the sampling to the WQCD in the form of monthly Discharge Monitoring Reports ("DMRs").

The WQCD has taken action when CRC's DMRs indicate possible exceedances.[2] For example, the WQCD notified CRC of permit violations occurring before April 1992 and negotiated a settlement relating to these alleged violations.[3] On March 19, 1993, the WQCD commenced action on post-April 1992 violations by issuing a Notice of Significant Noncompliance to CRC. (Def.'s Mot. Summ.J., Ex. C.) The notice identified violations of permit limits shown in CRC's self-monitoring DMRs in November and December of 1992 and January of 1993. In the notice, the WQCD advised CRC that, unless it "commits to a specific correction plan, we will have no alternative but to seek legal action to secure permanent compliance." (*Id.*)

On May 5, 1993, WQCD issued a Notice of Violation and Cease and Desist Order ("NOV"), (Def.'s Mot.Summ.J., Ex. D) to CRC relating to NPDES permit violations reflected in CRC's DMRs for the months of November 1992 through March 1993. The NOV ordered CRC, *inter alia,* to cease these violations and to submit a detailed statement of the measures taken to achieve compliance with the NOV. (*Id.* at 4.) The NOV indicated that the WQCD had the authority to

impose penalties under the CWQCA for violating the NPDES permit or the NOV. (*Id.*) In May 1993, CRC notified the WQCD of its intention to comply with the NOV and that there had been no exceedances since May 1, 1993. (*Id.,* Ex. E.) CRC provided the WQCD with the required statement of the measures taken to achieve compliance with the NOV. (*Id.,* Ex. F.) The WQCD then requested an itemized list of CRC's past and estimated future capital expenditures to attempt compliance with the Clean Water Act. (*Id.,* Ex. G.) CRC submitted the requested data. (*Id.,* Ex. J.) In July 1993, the WQCD requested further information from CRC to understand and evaluate fully its compliance, acknowledging however that CRC had "definitely progressed towards identifying sources of pollutants and solutions." (*Id.,* Ex. K.) CRC transmitted the requested information. (*Id.,* Ex. L.)

Up to the beginning of August 1993, CRC's plans for achieving long-term compliance involved a tank system to supplement the existing waste-water treatment plant. (Aff. Matsushima Supp.Def.'s Mot.Summ.J., ¶ 17.) In August 1993, CRC modified its compliance strategy to add a clarifier, a device used to allow solids to settle from treated wastewater and to collect the solids for return into or removal from the system. (*Id.*) The clarifier, constructed as a Resource Conservation and Recovery Act ("RCRA") requirement under the supervision of the WQCD, has halted all permit violations, the last of which occurred in April 1993. (*Id.*)

The WQCD and CRC are currently discussing the appropriate penalties to be assessed for CRC's post-April 1992 permit violations. (*Id.,* ¶ 18.) A Sierra Club representative attended the last meeting in January 1994 where penalty amounts were discussed. (*Id.*) In February 1994, CRC made a specific proposal to the WQCD and the Colorado Office of the Attorney General regarding basis for and payment of the proposed penalty. (Def.'s Mot.Summ.J., Ex. M.)

---

**2.** I have already expressed my reluctance to call "exceedance" a word at all but have acknowledged its use by Congress, litigants and other judges. *Ergo vox clamata in deserta. See Sierra*

*Club v. Colorado Refining Co.,* 838 F.Supp. 1428, 1430 n. 3. (D.Colo.1993).

**3.** See n. 1 above.

B. *Groundwater.*

In 1978, CRC's predecessor, Asamera, studied the groundwater beneath the refinery. (*Id.*, Ex. N.) The study acknowledged high levels of petroleum product under the Asamera and Conoco facilities. (*Id.*, Ex. A at 9). In April 1979, Conoco and Asamera entered into an agreement, (*id.*, Ex. O), to share "the cost of construction of an interceptor trench system located along the perimeter of the Facilities bordering Sand Creek." (*Id.*, Ex. B at 12). This agreement incorporated by reference a September 1978 stipulation between the WQCD and Conoco, (*id.*, Ex. P), requiring Conoco to commence promptly construction of the interceptor trench to prevent seepage into the surface water of Sand Creek. The interceptor trench was built in accordance with the stipulation. (Aff.Matsushima Supp.Def.'s Mot. Summ.J., ¶¶ 19–20.) However, tests conducted shortly after CRC purchased the refinery from Asamera in 1987 indicated that the interceptor trench had not prevented the seepage of contaminants from groundwater into Sand Creek adjacent to Conoco. (Def.'s Mot.Summ.J., Ex. B at 13.)

On March 8, 1989, in an effort to halt the flow of contaminants from the ground water into Sand Creek, CRC entered an Administrative Order on Consent (the "Consent Order"). The Consent Order was signed on behalf of CRC, Conoco, Inc., the United States Environmental Protection Agency's ("EPA's") Hazardous Waste Management Division (under § 3008(h) of the RCRA, as amended, 42 U.S.C. § 6928(h)[4]) and CDH's Hazardous Waste Control Section (under Colo.Rev.Stat. § 25–15–301(4) and 25–15–308 (1989 & Supp.1993[5]). (Def.'s Mot.Summ.J., Ex. B.) CRC and Conoco entered an agreement to share the costs of their obligations under the Consent Order. (*Id.*, Ex. Q.)

One of the objectives of the Consent Order was to "perform Interim Measures at the Facilities necessary to minimize or eliminate any releases of hazardous waste or hazardous constituents from or at the Facilities and to mitigate or eliminate any threats to human health or the environment from any such releases." (*Id.*, Ex. B at 4.) The Consent Order required CRC and Conoco to implement RCRA Facility Investigation and Corrective Measures Study which were "necessary to (1) fully characterize the source(s) of contamination; (2) characterize the potential pathways of contaminant migration; (3) define the degree and extent of contamination; (4) identify actual or potential receptors; and (5) support the development of remediation alternatives from which corrective measures will be selected by the [EPA and CDH] Agencies." (*Id.*, at 15.) The Consent Order required the EPA and CDH to review and approve "all Design Plans, Work Plans, and any draft or final reports submitted pursuant to this Consent Order," (*id.*, at 16), and authorized these agencies to request CRC and Conoco to perform additional work to accomplish the objectives of the order, (*id.*, at 17).

---

**4.** 42 U.S.C. § 6928 provides:
  **(h) Interim status corrective action**
    **(1)** Whenever on the basis of any information the Administrator determines that there is or has been a release of hazardous waste into the environment from a facility authorized to operate under section 6925(e) of this title, [one which is required to have and has applied for a permit for disposal of hazardous waste], the Administrator may issue an order requiring corrective action or such other response measure as he deems necessary to protect human health or the environment or the Administrator may commence a civil action in the United States district court in the district in which the facility is located for appropriate relief, including a temporary or permanent injunction.
    **(2)** Any order issued under this subsection may include a suspension or revocation of authorization to operate under section 6925(e) of this title, shall state with reasonable specificity the nature of the required corrective action or other response measure, and shall specify a time for compliance. If any person named in an order fails to comply with the order, the Administrator may assess, and such person shall be liable to the United States for, a civil penalty in an amount not to exceed $25,000 for each day of noncompliance with the order.

**5.** Section 301(4) empowers the CDH *inter alia* to "issue such orders as may be appropriate to protect ... the environment." Colo.Rev.Stat. § 25–15–301(4) (1989). Section 308 provides that department with powers of enforcement with regard to facilities engaged in prohibited acts in violation of or in the absence of a state or federal permit regarding the disposal of hazardous waste. Colo.Rev.Stat. § 25–15–308 (Supp. 1993).

The Consent Order and steps taken in compliance therewith are acknowledged in the NPDES permit issued to CRC, effective December 1, 1992:

> *Groundwater:* In 1978, groundwater monitoring at the site showed high levels of petroleum products in the groundwater under the facility. This problem was caused by past oil leakage and spills at the refinery, and was dealt with outside of the permit. Steps taken included a groundwater study, a groundwater monitoring program, and a mitigation program in conjunction with Conoco. The adjacent Conoco refinery has experienced the same groundwater contamination problem. In addition, subsurface oil has migrated from Colorado Refining to Conoco. There are also several oil seeps to Sand Creek along Conoco's northeast boundary. This situation is still being handled outside of this permit. The two refineries have a written agreement on sharing the cleanup costs, and a consent order (dated March 8, 1989) has been jointly agreed to by the refineries, EPA and the State Health Department's Hazardous Materials and Waste Management Division. Therefore, no additional controls or requirements for groundwater will be included under this permit.

*(Id.,* Ex. A at 9.) ·

Pursuant to the Consent Order, CDH monitors the progress of the cleanup of Sand Creek and the impact of any discharges to Sand Creek by contaminated groundwater. (Aff. Matsushima Supp.Def.'s Mot.Summ.J. ¶ 15.) Acting under the Consent Order and the auspices of CDH and the EPA, CRC and Conoco have made continuing efforts to reverse the discharges into Sand Creek through groundwater. They have constructed a barrier wall to try to stop the flow of free product into Sand Creek, installed twenty-five recovery wells to recover contaminants to reverse the flow of groundwater so that it no longer flows into Sand Creek, and installed an air injection system to assist in the biodegradation of pollutants. *(Id.,* ¶ 10.) WQCD representatives were present at meetings in 1993 between the signatories of the Consent Order when groundwater con-

taminations to Sand Creek was the topic of the meeting. *(Id.,* ¶ 11.) On December 21, 1993, the groundwater in eleven compliance monitoring wells was sampled and, in all but one case (unrelated to petroleum product seepage), met all groundwater standards for the State of Colorado. *(Id.,* ¶ 12.) The most recent sampling of the monitoring wells under the Consent Order occurred in February 1994, but the analysis has yet to be completed. *(Id.,* ¶ 13.) As part of CRC's compliance with the Consent Order, CRC conducts monthly water quality studies, monitoring the nature and impact of all discharges from the CRC facility and prepares DMRs which it submits monthly to the WQCD of CDH. *(Id.* ¶ 15.)

### C. *Sierra Club's Citizen Suits against CRC and Conoco.*

In February 1993, Sierra Club filed a citizen suit against Conoco alleging discharges to Sand Creek in violation of Conoco's NPDES permit and unpermitted discharges into Sand Creek in violation of the CWA. The Sierra Club settled its claim against Conoco in a consent judgment signed by the court on April 6, 1993. *(Id.,* Ex. S.) The order requires Conoco to take measures to terminate the discharge of pollutants, to pay a total of $1,040,000 to be used for the design and construction of a recreational corridor along Sand Creek, and to pay Sierra Club's attorney fees in the amount of $35,800. *(Id.)*

On August 12, 1993, Sierra Club filed this citizen suit against CRC, alleging similar unpermitted discharges to Sand Creek. The suit seeks injunctive relief requiring CRC to terminate its unpermitted discharges into Sand Creek, submit a plan to the court and Sierra Club describing measures necessary to cease all such discharges into Sand Creek, provide Sierra Club with its monthly samplings of ground and surface water, maintain a trained workforce sufficient to ensure compliance with the court's order, perform a study to determine the complete impact to the environment of Sand Creek caused by such discharges, and prepare and implement a complete toxic use reduction plan for its operations. Sierra Club also seeks payment of a penalty of $25,000 per day for each of

CRC's CWA violations, as well as attorney fees.

## II. *CRC's Motion for Summary Judgment.*

CRC seeks summary judgment on Sierra Club's three remaining claims. CRC seeks dismissal of both the first cause of action (for discharges into groundwater under the refinery which is ultimately discharged into Sand Creek) and the second (for violation of the effluent discharge limits of CRC's NPDES permit in November 1992 and the first quarter of 1993), on the grounds that governmental action has begun and is being diligently prosecuted for these alleged violations.

CRC additionally seeks dismissal of the first cause of action based on its contention that complete relief cannot be granted in this case without Conoco being joined in the action, as the geographical points at which pollutants are discharged via the groundwater into Sand Creek are all located on Conoco's property. CRC submits that Conoco, an indispensable party in this action, cannot be joined because Sierra Club has sued and entered into a consent judgment with Conoco relating to the same "seep" for which it now seeks to hold CRC responsible.

CRC seeks judgment on the third cause of action, which asserts that CRC has failed to determine the impact to Sand Creek of its noncomplying discharges as required by its NPDES permit, on the grounds that it has no basis in fact.[6]

### A. *Standards for Motion.*

Under Federal Rules of Civil Procedure 56(c), summary judgment is appropriate if the pleadings and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The opposing party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Summary judgment will be granted against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552.

### B. *Merits.*

1. *Preclusive Effect of 33 U.S.C. § 1319(g)(6)(A)(ii).*

CRC seeks dismissal of this citizen suit, relying on the CWA's bar against citizen suits for a violation "with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection." 33 U.S.C. § 1319(g)(6)(A)(ii). To establish whether a citizen suit is warranted, I must determine, with respect to the violations claimed in each cause of action, (1) whether governmental action has commenced and is being diligently prosecuted and, if so, (2) whether such action is being taken under federal or comparable state clean water acts.

(a) *First cause of Action for Unpermitted Discharges to Sand Creek.*

CRC argues that the state is diligently prosecuting an action under state law for the discharges into groundwater on which Sierra Club's first claim for relief is founded. CRC asserts that it entered the Consent Order in March 1989 pursuant to § 3008(h) of RCRA, as amended, 42 U.S.C. § 6928(h), and Colo.Rev.Stat. §§ 25–15–301(4), 25–15–308 (1989 & Supp.1993), as amended, for the express purpose of cleaning up and ceasing contamination of Sand Creek via groundwater. The Consent Order is expressly referenced in CRC's NPDES permit, which states that "no additional controls or requirements for groundwater will be included under this permit." (CRC Mot.Summ.J., Ex. B at 9.) CRC maintains that the State, through its reference to the requirements and conditions of the RCRA Consent Order in the NPDES permit, is diligently prosecuting an action

---

6. Sierra Club erroneously refers to CRC's noncompliance with two NPDES permits. It is undisputed that CRC only has one permit for its Commerce City facility.

under state law which acts as a bar to Sierra Club's citizen suit for the same groundwater violations.

Sierra Club responds that the 1989 Consent Order, rather than commencing an action against CRC for violations of the Clean Water Act, set forth a long-term plan for the study and cleanup of the CRC and Conoco refineries under RCRA, a separate statute. Therefore, Sierra Club argues that 33 U.S.C. § 1319(g)(6)(A)(ii) does not bar its first cause of action because the State did not, through the Consent Order, commence, nor is it diligently prosecuting, an action for administrative penalties comparable to CWA section 1319(g) with respect to CRC's unpermitted groundwater discharges into Sand Creek. Sierra Club additionally contends that, by its express terms, the Consent Order does not relieve CRC of its liability to comply with RCRA or any other statute or regulation[7] and does not preclude any regulation or enforcement under the Clean Water Act.[8] Finally, Sierra Club refers to CDH's Notice of Violation and Cease and Desist Order issued to CRC on November 10, 1993 under the authority of the state's Water Pollution Control Act, Colo.Rev.Stat. §§ 25–8–301 to 25–8–308 (1989), alleging years of unpermitted discharges of pollutants by CRC into Sand Creek. (Sierra Club's Opp. CRC's Mot. Summ.J., Ex. A.) Sierra Club maintains that this Notice of Violation is clear evidence that CDH does not consider the RCRA Consent Order to have constituted the commencement or diligent prosecution of CRC's violations of the CWA.

CRC replies that RCRA requires the Administrator of the EPA to "integrate all provisions of this chapter for purposes of administration and enforcement and [to] avoid duplication, to the maximum extent practicable, with the appropriate provisions of ... the Federal Water Pollution Control Act [33 U.S.C.A. § 1251 et seq.]." 42 U.S.C. § 6905(b). CRC maintains it was in support of this directive that the state authority referred to the RCRA Consent Order when it issued CRC's NPDES permit and relied upon it, stating that "no additional controls or requirements for groundwater will be included under this permit." Finally, CRC states that the issuance of the November 10, 1993 Notice of Violation is irrelevant to Sierra Club's first cause of action since the question is whether the State's diligent prosecution efforts have caused an abatement and remediation of the groundwater problems so as to render this citizens suit duplicative.

CRC entered the Consent Order in March 1989 pursuant to § 3008(h) of RCRA, as amended, 42 U.S.C. § 6928(h), and Colo.Rev. Stat. § 25–15–301(4) and § 25–15–308 (1989 & Supp.1993), as amended, for the express purpose of cleaning up and ceasing contamination of Sand Creek via groundwater. The Consent Order is expressly referenced in CRC's NPDES permit. I have already determined that the CWQCA under which the State issued the NPDES permit to CRC is "comparable State law" within the meaning of the CWA. *Sierra Club v. Colorado Refining Co.*, 838 F.Supp. 1428, 1436 (D.Colo. 1993). The NPDES permit acknowledges the monitoring of and efforts to remedy discharges into groundwater under the Consent Order and states that "no additional controls or requirements for groundwater will be included under this permit." (CRC Mot. Summ.J., Ex. A at 9.)

---

7. Sierra Club cites the following provisions of § XVII, Reservation of Rights, of the Consent Order:

Compliance by Respondents with the terms of this Consent Order shall not relieve Respondents of their obligations to comply with RCRA or any other applicable local, State or federal laws and regulations.

The Agencies' entrance into this Consent Order and Respondents' consent to comply shall not limit or otherwise preclude either of the Agencies from taking additional enforcement action against Respondents ... pursuant to any other applicable federal or state statute or regulation, should either of the Agencies determine that such actions are warranted. (Def.'s Mot.Summ.J., Ex. B at 29.)

8. Sierra Club cites RCRA § 1006(a):

Nothing in this chapter shall be construed to apply to (or to authorize any State ... to regulate) any activity or substance which is subject to the Federal Water Pollution Control Act [33 U.S.C.A. § 1251 et seq.] ... except to the extent that such application (or regulation) is not inconsistent with the requirements of such Acts. 42 U.S.C. § 6905(a).

Pursuant to the authority of the Consent Order, activities to cleanup the groundwater contamination have been conducted under the supervision of the EPA and CDH. (Aff. Matsushima Supp.Def.'s Mot.Summ.J. ¶ 10.) CRC and Conoco have constructed a system to reverse the flow of groundwater so that it no longer flows into Sand Creek. (*Id.*) Although analysis of data is incomplete, so far it shows that the new system will be effective in halting seeps to Sand Creek. (*Id.*, ¶¶ 12–13.)

Citizen suits are proper only "if the Federal, State and local agencies fail to exercise their enforcement responsibility." *Gwaltney of Smithfield v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60, 108 S.Ct. 376, 383, 98 L.Ed.2d 306 (1987) (*citing* S.Rep. No. 92–414, p. 64 (1971), *reprinted in* 2 A Legislative History of the Water Pollution Control Act Amendments of 1972, p. 1482 (1973)). In *North & South Rivers Watershed Ass'n v. Scituate*, 949 F.2d 552, 556 (1st Cir.1991), the court construed § 1319(g)(6)(A)(ii) and held that a state action could be regarded as being comparable to an action under § 1319(g) even though the state action did not seek to sanction the offender monetarily.

The primary function of the provision for citizen suits is to enable private parties to assist in enforcement efforts where Federal and State authorities appear unwilling to act. Congress has found it necessary expressly to "recognize, preserve and protect *the primary responsibility and rights of the States* to prevent, reduce and eliminate pollution." 33 U.S.C. § 1251(b) (emphasis supplied). It follows that "the citizen suit [under section 505] is meant to supplement rather than to supplant governmental [enforcement] action." *Gwaltney of Smithfield v. Chesapeake Bay Foundation*, 484 U.S. 49, 60, 108 S.Ct. 376, 383, 98 L.Ed.2d 306 (1987). Presumably, then, when it appears that governmental action under either the Federal or comparable State Clean Water Acts begins and is diligently prosecuted, the need for citizen's suits vanishes. *See Gwaltney*, 484 U.S. at 60–61, 108 S.Ct. at 383–384.

*Id.* at 555.

Both CDH and the EPA have addressed the concerns of the Sierra Club's first cause of action and have devised a plan of attack of CRC's unpermitted discharges into groundwater. Deference should be given to this plan. *See id.* at 557. As part of this plan, in November 1993, CDH issued a Notice of Violation to CRC under the authority of the state's Water Pollution Control Act alleging years of CRC unpermitted discharges of pollutants through groundwater. Sierra Club argues this is evidence that the state does not see itself as having diligently prosecuted CRC for its groundwater discharges through the Consent Order. To the contrary, the notice evidences an ongoing enforcement by the state of its ordered corrective measures.

Sierra Club here does not seek to "abate pollution when the government cannot or will not command compliance." *See Gwaltney*, 484 U.S. at 62, 108 S.Ct. at 384. Rather, Sierra Club attempts to balkanize federal and state water pollution statutes and the agencies which give them effect.

The focus of the statutory bar to citizen's suits is not on state statutory construction, but on whether corrective action already taken and diligently pursued by the government seeks to remedy the same violations as duplicative civilian action....

... [T]he goal of all actions brought under the Clean Water Acts is "to restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251(a). Duplicative actions aimed at exacting financial penalties in the name of environmental protection at a time when remedial measures are well under way do not further this goal.

*North & South Rivers*, 949 F.2d at 556.

Here, the relief sought by Sierra Club in its first cause of action duplicates the ongoing EPA and CDH approved and supervised remedial efforts outlined above concerning groundwater pollution. Therefore, I find that the first cause of action of Sierra Club's citizen suit is not proper, since neither state nor federal agencies have failed to exercise their enforcement responsibility in this regard. I grant CRC's motion for summary judgment regarding Sierra Club's first cause

of action.[9]

(b) *Second Cause of Action for Discharges to Sand Creek in Violation of NPDES Permit.*

CRC argues that Sierra Club's second cause of action is barred because the state commenced and is diligently prosecuting an action under state law for CRC's violations of the effluent discharge limits of its NPDES permit in November 1992 and in the first quarter of 1993. Sierra Club argues that the state must begin its diligent prosecution under state law comparable to 33 U.S.C. § 1319 before the date that the notice of intent is mailed by the citizen group. In addition, it claims that, in order to be prosecuting an alleged violator within the meaning of § 1319(g)(6)(A)(ii), the state must be attempting to assess penalties to the exclusion of other remedies.

The CWA requires a citizen-plaintiff to give sixty days' notice of an intent to sue to the alleged violator, the Administrator of the EPA and the state in which the violation occurs. 33 U.S.C. § 1365(b)(1)(A). A citizen cannot bring such suit regarding violations "with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection." *Id.* § 1319(g)(6)(A)(ii).[10] The provision further states that the bar does not apply if, before the commencement of the state enforcement action, the citizen-plaintiff has provided the required sixty-day notice and if the citizen-plaintiff thereafter files suit within 120 days after such notice. *Id.* § 1319(g)(6)(B)(ii).[11]

On March 19, 1993 CDH sent a Notice of Significant Noncompliance to CRC regarding CRC's unpermitted discharges in violation of its NPDES permit. Sierra Club sent its notice of intent to sue on April 15, 1993. On May 5, 1993, CDH issued a Notice of Violation and Cease and Desist Order to CRC regarding its permit violations. On August 12, 1993, within 120 days of its notice of intent to sue, Sierra Club filed this suit. Whether the bar to citizen suits applies turns on whether either of these actions by CDH constituted "commencement of an action" under 33 U.S.C. § 1319(g)(6)(A)(ii).

■ The word "action" under this subsection does not mean a lawsuit. Whereas 33 U.S.C. § 1365(b)(1)(B) bars a citizen suit if the state "has commenced or is diligently prosecuting a civil or criminal action in a court," § 1319(g)(6)(A)(ii) speaks only of a bar where the state "has commenced and is diligently prosecuting an action under a State law comparable to this subsection." "The crucial phrase 'in a court' is not found in section 1319(g)(6)." *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.,* 777 F.Supp. 173, 181 (D.Conn.1991) *aff'd in part, rev'd in part,* 989 F.2d 1305 (2d Cir.1993). Therefore, the issue is which of the CDH actions constituted the commencement of an administrative enforcement action.

■ The CWA does not define "commencement." Sierra Club cites *Public Interest Research Group of New Jersey, Inc. v. Elf Atochem North America, Inc.,* 817 F.Supp. 1164, 1172 (D.N.J.1993), in support of its contention that the Notice of Significant Noncompliance did not commence an action. In that case, the court held that "one

---

9. Because I grant summary judgment on the first cause of action on this ground, I do not reach CRC's second ground for dismissal of the first cause of action based on Sierra Club's inability to join Conoco, an indispensable party to this action.

10. I have already ruled that the NPDES permit was issued to CRC under "comparable State law" within the meaning of the CWA. *See Sierra Club v. Colorado Refining Co.,* 838 F.Supp. 1428, 1436 (D.Colo.1993).

11. CRC relies on the Supreme Court's statement in *Gwaltney of Smithfield v. Chesapeake Bay*

*Foundation, Inc.* that "[i]f the Administrator or the State commences enforcement action within the 60–day period, the citizen suit is barred, presumably because governmental action has rendered it unnecessary." 484 U.S. 49, 59–60, 108 S.Ct. 376, 382–83. This is true where the administrator or the state has filed a lawsuit within the sixty-day period. However, in this situation, where the state has commenced an administrative action under § 1319(g)(6)(A), the bar does not apply if the citizen-plaintiff files suit within 120 days of giving notice. 33 U.S.C. § 1319(g)(6)(B)(ii).

in a series of periodic reports ... which served to warn defendant that an enforcement action might be initiated in the future" did not commence an action within the meaning of 33 U.S.C. § 1319(g)(6)(A)(ii). *Id.* Here, however, CDH's Notice of Significant Noncompliance was not one of a periodic series. Further, rather than warn CRC that an enforcement action might be taken in the future, CDH demanded submission of a specific correction plan "before we pursue *further* action." (CRC Mot.Summ.J., Ex. C) (emphasis added).

In *Public Interest Research Group,* the court looked for guidance as to the meaning of "commencement" from specific procedures for the institution of enforcement proceedings under the relevant state act. *See* 817 F.Supp. at 1172. Adopting this approach, I look to Part 6 of the CWQCA entitled "Violations, Remedies, and Penalties" which provides in pertinent part:

(1) Whenever the division has reason to believe that the violation of [a] ... permit ... has occurred, the division shall cause written notice to be served ... by certified mail ... upon the alleged violator.... The notice shall state the provision alleged to be violated and the facts alleged to constitute a violation, and it may include the nature of any corrective action proposed to be required.

(2) Each cease and desist and clean-up order issued pursuant to sections 25–8–605 and 25–8–606 shall be accompanied by or have incorporated in it the notice provided for in subsection (1) of this section unless such notice has been given prior to the issuance of such cease and desist or clean-up order.

Colo.Rev.Stat. § 25–8–602 (1989).

CDH served the Notice of Significant Noncompliance on CRC in compliance with the above procedures for the institution of enforcement proceedings under the CWQCA. CDH served the notice by certified mail upon CRC before it issued the Notice of Violation and Cease and Desist Order, advising CRC of permit violations and instructing it to provide a specific correction plan, failing which penalties would most likely be imposed. I find that when CDH sent the Notice of Sig-

nificant Noncompliance, it "commenced an action" within the meaning of 33 U.S.C. § 1319(g)(6)(A)(ii).

■ Sierra Club further argues that the state must be attempting to assess penalties, to the exclusion of other remedies to satisfy the prosecution requirement of § 1319(g)(6)(A)(ii). I disagree. In *Arkansas Wildlife Federation v. Bekaert Corp.,* the court noted the "crucial differences in the language contained in § 1319(g)(6)(A)(ii) and that found in § 1319(g)(6)(A)(i).... § 1319(g)(6)(A)(i) requires the diligent prosecution of an 'action under this subsection' before the bar to a citizen suit applies.... The term 'this subsection' obviously refers to § 1319(g) which provides for administrative penalties." 791 F.Supp. 769, 774–75 (W.D.Ark.1992). The difference in the language of these two subsections indicates that, whereas § 1319(g)(6)(A)(i) only precludes a citizen suit where the administrator or state is diligently prosecuting an action for administrative penalties, § 1319(g)(6)(A)(ii) does not contain this limitation. *See id.* at 775; *see also Connecticut Coastal Fishermen's Ass'n,* 777 F.Supp. at 181 (§ 1319(g)(6)(A)(ii) "bars citizen suits where a state agency conducting enforcement proceedings has authority to assess civil penalties, regardless of whether the agency has actually assessed such penalties.") Moreover, if and when penalties are assessed, Sierra Club will be part of the process as it attended the January 12, 1994 meeting between CRC and CDH during which penalties were discussed. (Aff. Matsushima Supp. CRC's Mot.Summ.J. ¶ 18.)

I conclude that CDH commenced an enforcement action under state law when it served the Notice of Significant Noncompliance, before Sierra Club issued its notice of intent to sue and that it has since been diligently prosecuting such action. I find that Sierra Club's citizen suit duplicates and is barred by the state enforcement action. Accordingly, I grant CRC's motion for summary judgment on Sierra Club's second cause of action.

(c) *Third Cause of Action for Failure to Determine the Impact to Sand Creek of Noncomplying Discharges.*

■ In its third cause of action, Sierra Club asserts that CRC has failed to deter-

mine the impact to Sand Creek of its non-complying discharges, as required by its NPDES permit and the CWA. CRC seeks judgment on this claim on the grounds that it has no basis in fact. CRC asserts that it has sampled Sand Creek on a monthly basis pursuant to the Consent Order and continues to do so. (*Id.,* ¶ 15.) The DMRs indicate the quality of the water and thus monitor the nature and impact of all discharges, complying and noncomplying, by CRC into Sand Creek. (*Id.*)

Sierra Club's response fails to raise any issue of triable fact regarding its allegation that CRC has failed to determine the impact to Sand Creek of its noncomplying discharges. Sierra Club does not challenge the affidavit of Mr. Matsushima to the effect that CRC has complied with the monitoring requirements of its permit and the Consent Order. Sierra Club requests that it be allowed to complete discovery before responding to CRC's motion regarding the third cause of action. Sierra Club maintains that, only upon completion of discovery, will it be able to determine whether and to what extent CRC has monitored the impact to Sand Creek of the noncomplying discharges.

> Although the Supreme Court has held that, under Fed.R.Civ.P. 56(f), "summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 2511 n. 5, 91 L.Ed.2d 202 (1986), this protection arises only if the nonmoving party files an affidavit explaining why he or she cannot present facts to oppose the motion. *Weir v. Anaconda Co.,* 773 F.2d 1073, 1082 (10th Cir.1985). "Where a party opposing summary judgment and seeking a continuance pending completion of discovery fails to take advantage of the shelter provided by Rule 56(f) by filing an affidavit, there is no abuse of discretion in granting summary judgment if it is otherwise appropriate." *Pasternak v. Lear Petroleum Exploration, Inc.,* 790 F.2d 828, 832–33 (10th Cir.1986).

*Dreiling v. Peugeot Motors of Am., Inc.,* 850 F.2d 1373, 1376–7 (10th Cir.1988); *see also*

*Universal Money Centers, Inc. v. American Tel. & Tel. Co.,* 22 F.3d 1527, 1532 (10th Cir.1994).

Sierra Club has not filed an affidavit and therefore, has not availed itself of the protection of Rule 56(f). Accordingly, since Sierra Club has not designated any specific facts showing that there is a genuine issue for trial as to whether CRC has failed to determine the impact to Sand Creek of its noncomplying discharges, summary judgment is appropriate on the third cause of action.

### III. *Conclusion.*

I grant CRC's summary judgment motion as to all three of Sierra Club's remaining claims. Accordingly,

IT IS ORDERED THAT CRC's motion for summary judgment is GRANTED;

IT IS FURTHER ORDERED THAT Sierra Club's motion for partial summary judgment and motion to amend complaint are DENIED as moot.

IT IS FURTHER ORDERED THAT this case is DISMISSED. Each party to bear its own costs.