The STATE OF IDAHO, Plaintiff,

v.

HANNA MINING COMPANY, Noranda Mining, Inc., Noranda Exploration, Inc., Defendants.

Civ. No. 83–4179.

United States District Court, D. Idaho.

Dec. 23, 1987.

---

Jim Jones, Idaho Atty. Gen., John J. Hockberger, Jr., Patrick J. Kole, Cheryl R. Koshuta, Deputy Attys. Gen., Dept. of Health and Welfare, Div. of Environment, Clive J. Strong, Chief, Natural Resources Div., State of Idaho, Boise, Idaho, for plaintiff.

Gary D. Babbitt, Don A. Olowinski, Hawley, Troxell, Ennis & Hawley, Boise, Idaho, Wesley F. Merrill, Kim B. Loveland, Merrill & Merrill, Pocatello, Idaho, for Hannah Min. Co.

W. Hugh O'Riordan, Lindsay, Hart, Neil & Weigler, Boise, Idaho, Anthony O. Garvin, Landels, Ripley & Diamond, San Francisco, Cal., for Noranda Min., Inc. and Noranda Exploration, Inc.

## MEMORANDUM DECISION

CALLISTER, Chief Judge.

The Court has before it defendants' motion to dismiss and/or for summary judgment. Because the Court has examined matters outside the pleadings, the Court will treat this motion as one for summary judgment. *See* Fed.R.Civ.P. 12(b). The Court has heard oral argument on the motion and it is ready to be resolved. The Court must determine whether there exist any genuine issues of material fact. *See* Fed.R.Civ.P. 56(c).

The basic facts of this case were set out in the Court's memorandum decision filed January 30, 1986, and will be incorporated fully herein by reference. Instead of repeating those facts, the Court will simply review the status of the case.

This is an environmental law action brought for injunctive and monetary relief by the State of Idaho. The State originally sued Howmet Turbine Component Corporation (Howmet), Hanna Mining Company (Hanna), Noranda Mines Limited and Noranda Exploration, Inc. (collectively Noranda). Defendant Howmet was voluntarily dismissed from the action by the plaintiff, and the action is continuing against the other three defendants.

In its complaint, the State alleges that the defendants disposed of large quantities of mining wastes and hazardous chemicals in and around five creek drainages located in Lemhi County. The State argues that these wastes have all been produced from the operation of the Blackbird Mine. That mine produces copper and cobalt, with the majority of the mining having taken place between 1949 and 1967. Since 1967, little or no commercial mining operations have been conducted at the mine, although the defendants have run two small pilot programs to test the feasibility of reopening mining operations. Ultimately, the defendants decided that a full-scale mining operation would not be feasible, and the project was not completed.

Defendant Hanna Mining acquired the mine in 1967. It kept crews at the site but never undertook commercial mining there. Noranda conducted exploration activities at the mine between 1978 and 1982. In August 1980, Hanna and Noranda Mines Limited formed a limited partnership, Blackbird Mining Company, which acquired the property. Noranda proceeded with limited mining at the Blackbird Mine from December 1979 to May 1982.

Between the 1890's and 1967, ore tailings were disposed of throughout the Blackbird Creek drainage system. Drainage from the mine and these tailings contained significant concentrations of various forms of copper, cobalt and iron, and is very acidic. The State contends that the drainage enters both ground and surface waters and has caused fish kills, reductions in or elimination of the spawning runs of anadromous fish, and other adverse effects on the acquatic life in nearby streams.

The State sued the defendants for damages to its natural resources under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) and various common law theories of liability. In response to original motions for summary judgment, this Court held that although the State's action was timely under CERCLA's statute of limitations, the State had failed to give notice of its claim at least sixty days in advance of filing suit. This Court dismissed the claim under CERCLA for that reason and refused to exercise its discretionary jurisdiction over the pendent claims. 627 F.Supp. 1274.

That decision was appealed to the Ninth Circuit and affirmed in part and reversed in part, 814 F.2d 1376. The Ninth Circuit affirmed this Court's decision that the State's action was timely, but reversed the decision holding that sixty day's notice was required. The case was remanded to this Court for further proceedings. The defendants now assert a number of other grounds in these motions for summary judgment.

■ Defendants first argue that the CERCLA claim must be dismissed because the environmental damages complained of were fully set forth in an Environmental Impact Statement (EIS). *See* Exhibit 5 to Affidavit of Joseph Scheuering. Specifically, CERCLA provides, at 42 U.S.C. § 9607(f), that no liability shall be imposed under the Act

> where the party sought to be charged has demonstrated that the damages to natural resources complained of were specifically identified as an irreversible and irretrievable commitment of natural resources in an environmental impact statement, or other comparable environmental analysis, and the decision to grant a permit or license authorizes such commitment of natural resources, and the facility or project was otherwise op-

erating within the terms of its permit or license. . . .

The terms "irreversible" and "irretrievable" were defined in the Forest Service regulations as follows:

> *Irreversible:* Applies primarily to the effects of use of nonrenewable resources, such as minerals or cultural resources, or to those factors that are renewable over long time-spans, such as soil productivity. It is a term that describes the loss of future options.

> *Irretrievable:* A term that applies to the loss of production, harvest or use of natural resources. For example, some or all of the timber production from an area is lost irretrievably when the area is serving as a winter sports site. The production loss is irretrievable, but the action is not irreversible. If the use changes, it is possible to resume timber production.

*See* 46 Fed.Reg. at p. 57,013 (1981).

When a project is allowed to proceed even though it will cause irreversible and irretrievable damages, a trade-off has occurred and no liability will accrue under CERCLA for these identified damages.[1] The EIS at issue here did identify some irreversible and irretrievable commitments of natural resources expected to be caused by the proposed Blackbird project. For instance, the EIS found that the construction of a tailings disposal area; the removal of clay materials; and the dumping of 82,000 cubic yards of waste rock, would have an effect that would be "irreversible" (*see* pp. 5–24, 5–25) and "irretrievable" (*see* p. 5–26). The State would be clearly barred from seeking relief for these damages. But the Blackbird project was never initiated, and the main purpose of the State's suit is not to clean up wastes dumped by the defendants themselves. Rather, the State is mainly seeking relief for wastes dumped by prior owners that the State

---

1. The legislative history of this provision of CERCLA can be found in the Senate Report which provides:

> In such a case where the specific resource trade-offs are understood and anticipated, and in issuing the permit for such releases the agency takes into account this knowledge and allows the trade-off, then no liability under this Act will accrue for resources damage pursuant to those permitted releases.

*See* S.Rep.No. 96–848, 96th Cong., 2d Sess. (1980) at p. 88.

alleges continue to be a problem.[2] Thus, the real issue under § 9607(f) is whether the damages caused by historical mining activities, *i.e.*, caused by waste disposals done by prior owners, were identified by the EIS as irreversible and irretrievable. On this issue, the EIS does find that the historic activities caused severe problems that exist today. For example, the EIS states that the historic mining activities have caused vegetation cover and water quality to be "severely degraded." *See* p. 2–5. On that same page, it states that past mining activities have done "severe damage" to vegetation, water, and fish. The EIS goes on to conclude that high concentrations of copper in the water, caused by past mining, are deadly to aquatic life, and it details extensive fish kills caused by the leeching of minerals into the streams. *See* p. 2–11.

After examining this damage, the report then concludes that "although a return to pre-mining water quality can be postulated, the methods of achieving such a goal are either unknown or economically infeasible at this point in time." *See* p. 4–29. Because of this, "the agencies decided that returning the study area streams to their natural state was not a precondition for the reopening of the mine." *See* p. 5–12. The words "irreversible" and "irretrievable" were never used to describe the damages caused by the historic mining activities. But the report did conclude, as quoted above, that it was impossible to return the water to its pre-mining condition. And the State agreed to allow the defendants to proceed with the Blackbird project without returning the area to its natural condition. It now appears that the State seeks, through this lawsuit, to go back on that agreement and force defendants to clean up the area. Unfortunately, the defendants' remedy for this unfairness must follow from some source other than the very strict language of § 9607(f). That provision creates an escape-hatch from liability only when the natural resource damages were "specifically identified as an irrevers-

ible and irretrievable commitment of natural resources." The words "irreversible" and "irretrievable" are terms of art, defined in the Forest Service regulations. They were used in the EIS to describe the projected effect that the Blackbird Mine project might have on natural resources. But these terms were not used to describe the effect of historical mining activities on the natural resources. Because there was no such specific finding in the EIS concerning damages caused by historical mining activities, the Court finds § 9607(f) inapplicable to those damages. To the extent that this decision exalts form over substance, the remedy lies with Congress. This Court cannot re-write the statute.

■ In addition to the EIS, there was also an Environmental Assessment (EA) prepared in connection with Noranda's pilot project. The function of the EA was to determine whether an EIS should be done to examine the pilot project. The EA concluded that no EIS was necessary and stated that "no significant irreversible or irretrievable commitments of resources" would be caused by the pilot project. Thus, it is clear that any damages caused by the pilot project would not fall within the § 9607(f) exception. Although the EA, like the EIS, detailed the past damage done by historic mining activities, there was no specific finding that these damages were "irreversible and irretrievable." Thus, the EA does not provide any additional ammunition to defendants' argument under § 9607(f).

■ CERCLA does, however, contain other exceptions to liability. Under § 9607(j), damages caused by a "federally permitted release" must be recovered under other statutes, not CERCLA. A "federally permitted release" includes discharges covered by a permit issued under the Clean Water Act, 33 U.S.C. § 1342. These permits are known as "National Pollutant Discharge Elimination System" (NPDES) permits. A NPDES permit was issued to defendant Noranda Mining, Inc.,

---

**2.** On the present record, it is impossible for the Court to determine who disposed the wastes the State is seeking to clean up. Although the Court can make no findings in this area, it appears that most of the disposals were done by parties other than the defendants.

on September 25, 1980, and re-issued on September 28, 1984. *See* Attachment 11 to Affidavit of Joseph Scheuering. The defendants argue that this permit covers all discharges which the State complains of, and thus the State should have brought suit under the Clean Water Act, not CERCLA.

A NPDES permit only regulates "point source" discharges. *See National Wildlife Federation v. Gorsuch,* 693 F.2d 156 (D.C.Cir.1982). The discussion in *Gorsuch* of the legislative history behind the Clean Water Act is illuminating:

> In 1972, the Congress made a clear and precise distinction between point sources, which would be subject to direct federal regulation, and non-point sources, control of which was specifically reserved to state and local governments....

*Id.* at 176 (quoting from 1977 U.S.Code Cong. & Ad.News, 4326, 4334–35). The term "point source" is defined in the Clean Water Act at 33 U.S.C. § 1362:

> The term "point source" means any discernible, confined and discreet conveyance including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discreet fissure, container, rolling stock, concentrated animal feeding operation, or vessel, or other floating craft from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture.

A "non-point source" is defined by exclusion, and includes all water quality problems not included in the above definition of "point source." *See National Wildlife Federation v. Gorsuch, supra,* at 166.

The NPDES permit issued to Noranda covered specific point sources known as Outfalls 001–004. The defendants argue that "it is apparent that the NPDES permit was intended to authorize Noranda's overall operations at the Blackbird Mine, not just the specific discharges listed in the permit." *See* Defendants' Memorandum filed March 18, 1985, at p. 28. But the NPDES permit, as discussed above, could only regulate point sources. The permit itself only listed specific point sources known as Outfalls 001–004. The defend-

ants respond by asking "if the State believes that there were discharges from the Blackbird Mine which were not regulated by the NPDES permit, why didn't the State request revision of the draft permit to include such discharges?" *See* Defendants' Joint Supplemental Reply Memorandum filed September 23, 1987, at p. 16. Defendants also point out that the State certified that the discharges covered by the NPDES permit complied with the Clean Water Act. The State answers that it is seeking damages mainly for discharges from non-point sources which could not be regulated by the NPDES permit, and which were not the subject of the State's certification.

The record is not sufficient to determine whether the damages here were caused by point source discharges or non-point source discharges. To the extent that the damages were caused by Outfalls 001–004, the NPDES permit would preclude suit under CERCLA. But the NPDES permit does not apply to non-point source discharges. The record does not show whether the State exercised its exclusive power to regulate non-point sources of pollution. Apparently the State did nothing, and is now using this lawsuit as its means of regulation. Whether that is proper is not an issue raised by the motions before this Court.

The Court therefore finds that the NPDES permit only controlled point source discharges from Outfalls 001–004. Regulation of non-point sources of pollution were the exclusive responsibility of the state. The record is not sufficient to determine whether the damages sought by the State in this case emanated from Outfalls 001–004 or from other sources. While the State is barred from seeking recovery under CERCLA for damages emanating from Outfalls 001–004, questions of fact preclude any further findings by this Court in this area.

■ The defendants argue next that mining wastes are not "hazardous substances" regulated by CERCLA. CERCLA defines hazardous substances as follows:

"Hazardous substance" means

(A) any substance designated pursuant to § 311(b)(2)(A) of the Federal Water Pollution Control Act;

(B) any element, compound, mixture, solution, or substance designated pursuant to § 102 of this Act;

(C) any hazardous waste having the characteristics identified under or listed pursuant to § 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by act of Congress);

(D) any toxic pollutant listed under § 307(a) of the Federal Water Pollution Control Act;

(E) any hazardous air pollutant listed under § 112 of the Clean Air Act; and

(F) any emanately hazardous chemical substance or mixture with respect to which the administrator has taken action pursuant to § 7 of the Toxic Substances Control Act. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquified natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

It is undisputed that the mining wastes at issue here fall both within subsection (A) and (C) of the above definition of hazardous substances. With regard to subsection (C), the defendants point out that the regulation of mining wastes has been suspended under the Solid Waste Disposal Act, and therefore defendants argue that mining wastes are not covered at all under CERCLA. But mining wastes are also covered under subsection (A). The exception for wastes, the regulation of which under the Solid Waste Disposal Act has been suspended, only applies to those wastes located under subsection (C). Because mining wastes are still covered under subsection (A), the fact that their regulation has been suspended under the Solid Waste Disposal Act is not fatal to the State's CERCLA claim. This was precisely the issue before The Honorable Harold L. Ryan of this district in *State of Idaho v. Bunker Hill Company*, 635 F.Supp. 665 (D.Idaho 1986). Judge Ryan held that mining wastes were included under CERCLA despite the suspension of the regulation of mining wastes under the Solid Waste Disposal Act. *Id.* at 673. The Court agrees with the reasoning of Judge Ryan. For these reasons, the Court finds that mining wastes are covered under CERCLA.

■ The defendants argue next that the Idaho Environmental Protection and Health Act of 1972 (EPHA), Idaho Code §§ 39–101 to 39–114, establishes a comprehensive regulatory program preempting plaintiff's common law action for nuisance. Judge Ryan was faced with this identical issue in the case of *State of Idaho v. Bunker Hill Company, supra.* Judge Ryan found that the EPHA expressly recognized nuisance claims. He went on to hold that if the legislature had intended to preempt the State's nuisance claim, it must clearly appear from the language of the EPHA or other indicia of legislative intent. Judge Ryan could find nothing in the EPHA or in the legislative history to support the preemption claim.

The defendants cite *Envirosafe Serv. of Idaho v. County of Owyhee*, 112 Idaho 687, 735 P.2d 998 (1987) in support of their argument. In that case, the Idaho Supreme Court struck down an Owyhee County statute on the grounds that it was preempted by the Hazardous Waste Management Act of 1983, Idaho Code §§ 39–4401 to 39–4432. That case is, unfortunately, of little assistance to this Court because the standard of review employed by the Idaho Supreme Court was much different than that employed by this Court. *Envirosafe* involved a conflict between state laws and county regulations; the case at bar involves state law and common law. In *Envirosafe*, the Idaho Supreme Court reviewed the Owyhee County regulation under the doctrine of implied preemption. That is, even if the state law does not specifically preempt local regulation, preemption will be presumed where

the State has acted in a pervasive manner to occupy an entire field of regulation. In this case, the doctrine of implied preemption does not apply, and in fact an opposite standard is used. Statutory changes abolishing the common law are not presumed. *See Williams v. Blakely*, 114 Idaho 323, 757 P.2d 186 (1987). This was essentially the standard of review adopted by Judge Ryan in his decision finding that the EPHA did not preempt a common law action for nuisance. The Court finds that Judge Ryan's decision is well reasoned and will follow it.

■ The defendants argue next that the nuisance action is barred by the four-year statute of limitations contained in Idaho Code § 5–224. The State agrees that this is the applicable statute. The issue is whether the nuisance is temporary or permanent. Under Idaho law, it is well settled that where the nuisance is permanent, the cause of action must be commenced within four years from the date the permanent nuisance was created or occurred. *See State of Idaho v. Bunker Hill Company*, 600 F.Supp. 797 (D.Idaho 1985). If the action is not so maintained, the statute of limitations bars any recovery for the permanent nuisance. Where the nuisance is temporary and continuing in nature, the statute of limitations does not run and an action may be brought at any time to recover damages occurring within the previous limitation period.

In the *Bunker Hill* case, cited above, Judge Ryan found many factual disputes concerning whether the nuisance was permanent or temporary and he denied summary judgment. Generally, it is a question of fact for the jury as to whether a nuisance is permanent or temporary. *See Alesko v. Union Pacific Railroad*, 62 Idaho 235, 109 P.2d 874 (1941).

Given these standards, the Court will examine the defendants' motion. The Idaho Supreme Court has recently stated that a nuisance is temporary "if the cause of injury is abatable or preventable and the injury capable of rectification by reasonable restoration." *See Shaw v. City of Rupert*, 106 Idaho 526, 528, 681 P.2d 1001,

1002 (1984). A nuisance is permanent if the "cause of the injury would most likely be unabatable, thus indicating an injury that would not be temporary." *Id.* 106 Idaho at 528, 681 P.2d at 1003. On the state of the present record, the Court finds questions of fact concerning whether the nuisance is temporary or permanent. The Court does not have enough evidence before it concerning the potential for cleaning up these mining wastes to hold as a matter of law that the damages are "capable of rectification by reasonable restoration" or "would most likely be unabatable." The Court will therefore deny the summary judgment on the statute of limitations issue.

■ The defendants next seek dismissal of the nuisance claim under authority of Idaho Code § 52–108. That statute provides that "nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." In this case, the State and defendant Noranda Mining, Inc., entered into a Compliance Schedule Order in September 1980. By the terms of this agreement, Noranda Mining was required to construct a waste water treatment plant to treat acid mine drainage, and to install a culvert to isolate the flow of Meadow Creek away from a certain waste pile. In addition, Noranda Mining was to remove all trash and debris from the stream channels of the Blackbird Creek drainage by December 31, 1981. In addition, among other things, Noranda Mining also agreed to comply with all the terms of the NPDES permit. Most importantly, the parties agreed that:

Compliance with this order and with the issued National Pollutant Discharge Elimination System permit during their terms constitute compliance, for purposes of enforcement, with the "water quality standards and waste water treatment requirements," Title I, Chapter 2, Idaho Department of Health and Welfare rules and regulations.

*See* paragraph XI of Compliance Schedule Order, Attachment 1 to Affidavit of Joseph Scheuering. Defendants point out that there are no allegations that the Compli-

ance Schedule Order or the NPDES permit were violated, and thus the defendants' mining activity did comply with the Idaho Department of Health and Welfare rules and regulations. Because they were in compliance with these regulations, the defendants argue that Idaho Code § 52–108 exempts them from any liability for a nuisance. But Idaho Code § 52–108 only exempts a party from a nuisance action when the activity is done under the express authority of a statute. Here, although the defendants were in compliance with rules and regulations of the Idaho Department of Health and Welfare, the defendants have not yet established that the activities sued upon by the State in this action were done or maintained under the express authority of a statute. The State is mainly seeking to clean up damages caused by historical mining activities, and defendants have not shown that these activities, occurring mostly before defendants took over the site, were expressly authorized by a statute. For this reason, the Court must deny the summary judgment based on Idaho Code § 52–108.