**VILLAGE OF OCONOMOWOC LAKE, Plaintiff–Appellant,**

v.

**DAYTON HUDSON CORPORATION, et al., Defendants–Appellees.**

No. 93–3380.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 16, 1994.

Decided May 18, 1994.

Matthew W. O'Neill, William S. Roush, Jr. (argued), Friebert, Finerty & St. John, Milwaukee, WI, for Village of Oconomowoc Lake.

Jon P. Axelrod, Dewitt, Porter, Huggett, Schumacher & Morgan, Madison, WI, for Dayton–Hudson Corp.

Frank D. Remington, Asst. Atty. Gen., John S. Greene (argued), Wis. Dept. of Jus-

tice, Madison, WI, for George E. Meyer and Wisconsin Dept. of Natural Resources.

Paul G. Kent, Dewitt, Porter, Huggett, Schumacher & Morgan, Madison, WI (argued), for City of Oconomowoc.

Before EASTERBROOK and MANION, Circuit Judges, and McDADE, District Judge.*

EASTERBROOK, Circuit Judge.

Target Stores, a division of Dayton Hudson Corporation, is building a warehouse (which it calls a "distribution center") in the City of Oconomowoc, Wisconsin. It holds all necessary state and local permits. Federal clearance is unnecessary, for the Environmental Protection Agency has authorized Wisconsin to perform the tasks required by the Clean Air and Clean Water Acts. The Village of Oconomowoc Lake, a nearby municipality, wishes the warehouse would disappear. We have for decision one among more than a dozen suits and administrative proceedings the Village has commenced in pursuit of that objective.

Warehouses do not spew pollutants, but they have indirect effects. Trucks that carry goods to and from the warehouse emit nitrogen oxides and other gasses. A well-sited warehouse cuts down on wasted movement of goods, and therefore on pollution in the United States as a whole, but increases the volume of emissions nearby. While parked near the warehouse trucks drip oil, which collects in the runoff from a storm. A few inches of rain falling on a large paved surface means many acre-feet of water. This warehouse has a retention pond, from which the water seeps into the ground—carrying hydrocarbons and other unwelcome substances, the Village fears.

State officials concluded that the warehouse would be such a trivial source of pollution that it should not be classified as a "major source" requiring full scrutiny. The Village wanted a federal judge to inquire further, but the judge declined to cooperate. The Clean Air Act requires permits only for "stationary sources" of pollution. A definitional provision provides not only that vehi-

cles are not "stationary sources" but also that vehicular emissions are not attributed to the buildings served as points of origin or destination. 42 U.S.C. § 7602(z); see also 42 U.S.C. § 7410(a)(5)(C). Whatever requirements the state has added to federal law must be enforced in state court, the judge held. As for the rainwater runoff: the Clean Water Act regulates discharges into "navigable waters from a point source". 33 U.S.C. § 1362(12). Parking lots and retention ponds are not exactly "navigable," but another statute defines "navigable waters" as all "waters of the United States". 33 U.S.C. § 1362(7). Some water from the pond evaporates into the air, and the rest seeps into the ground. Even though ground water eventually reaches streams, lakes, and oceans, the court held, it is not part of the "waters of the United States". The district court accordingly dismissed the complaint under Fed. R.Civ.P. 12(b)(1).

As a rule, persons wishing to sue under the Clean Air Act must give 60 days' notice to the potential defendant. 42 U.S.C. § 7604(b). Notice provisions pervade environmental statutes, and would-be plaintiffs often appear to be desperate to evade them. *Hallstrom v. Tillamook County*, 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989); *Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320 (7th Cir.1992). Why plaintiffs are unwilling to wait even 60 days—when an effort to jump the queue may lead to outright dismissal of the case under *Hallstrom*—eludes us. The Village filed suit only three days after giving notice. To justify this expedition, it invoked 42 U.S.C. § 7604(a)(3), which is not subject to the 60-day rule. Although this enabled it to sue 57 days sooner than it could have done had it used § 7604(a)(1) as the foundation for the suit, the strategy does little besides illustrate the adage that haste makes waste. (This saying predates the Clean Air Act and shows that not all waste is within federal jurisdiction.)

■ Section 7604(a)(3) permits a citizen to file a civil action

---

* Hon. Joe Billy McDade, of the Central District of Illinois, sitting by designation.

against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under ... part D of subchapter I of this chapter (relating to nonattainment) or who is alleged to be in violation of any condition of such permit.

The warehouse is in a "nonattainment" area, and the Village contends that it lacks the permit required for a "major emitting facility". Wisconsin treated the warehouse as a minor rather than a major source. But to use § 7604(a)(3) the Village had to show that "part D of subchapter I of this chapter" requires a major-facility permit, and it is impossible to see how this could be so. Recall that the warehouse itself does not emit pollutants and that the Clean Air Act does not require the attribution of motor-vehicle emissions to stationary sources. 42 U.S.C. § 7410(a)(5)(A), (C); see also *South Terminal Corp. v. EPA,* 504 F.2d 646, 668 n. 24 (1st Cir.1974). "[P]art D of subchapter I" does not require Dayton Hudson to obtain a permit; any such requirement must come from Wisconsin law and therefore cannot serve as the foundation for suit under § 7604(a)(3).

If the Village had waited for the prescribed 60 days, it would have been eligible to use § 7604(a)(1), which authorizes citizen suits

against any person ... who is alleged to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.

If this had been the foundation of the suit, and if we were to assume that the emissions from trucks going to and from the warehouse violate Wisconsin's implementation plan—for the state has elected to regulate such indirect emissions despite the lack of federal compulsion to do so—then it would have been necessary to decide whether a provision of a state plan going beyond the federal minima is "an emission standard or limitation under this chapter". States must clear their implementation plans with the EPA and enforce them faithfully; it is accordingly possible to characterize a state's rules as "an emission standard or limitation under this chapter" in the sense that it is *adopted* under the chapter and includes rules that *satisfy* the chapter. It may even be that rules going beyond federal requirements are essential to satisfy federal law. How could that be? Suppose the EPA approved a plan that was less stringent in some respects than the EPA would have demanded, only because in other respects it did more than federal law required and the rules, taken as a whole, would produce the desired cleanliness. Then failure to comply with the "extra" rules would reduce air quality below the federal minimum. The EPA believes that federal courts (and the Administrator) may enforce provisions in state plans. 40 C.F.R. § 51.165(a)(1)(xiv). We need not decide whether this means enforcement under § 7604(a)(1), as some courts have held. E.g., *Coalition Against Columbus Center v. New York City,* 967 F.2d 764, 771 (2d Cir.1992); *Delaware Valley Citizens Council v. Davis,* 932 F.2d 256, 265–67 (3d Cir.1991). See also *Sierra Club v. Larson,* 2 F.3d 462, 469 (1st Cir.1993) (remarking that indirect-source rules in a state implementation plan "may at least in some circumstances be within the purview of a citizens suit under 42 U.S.C. § 7604."). But see *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co.,* 12 F.3d 353, 358–60 (2d Cir.1993) (provisions of state plans exceeding federal requirements are not enforceable under provisions of the Clean Water Act parallel to § 7604). There will be ample opportunity for full consideration when the need arises.

■ The Village's claim under the Clean Water Act does not depend on any state rule or plan. This time the obstacle is the limitation of the Act's coverage to the "waters of the United States." Rainwater runoff from the 110–acre site (including 25 acres of paved parking) will collect in a 6–acre artificial pond. The pond is supposed to retain oil, grease, and other pollutants while "exfiltrating" the water to the ground below. The Clean Water Act is a broad statute, reaching waters and wetlands that are not navigable or even directly connected to navigable waters. *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). But not even the EPA

shares Justice Story's view that the national government has regulatory power over every drop of water: "It was said of the late Justice Story, that if a bucket of water were brought into his court with a corn cob floating in it, he would at once extend the admiralty jurisdiction of the United States over it." Note, 37 Am.L.Rev. 911, 916 (1903). See *DeLovio v. Boit,* 7 Fed.Cas. 418 (No. 3,776) (CC Mass.1815). The Agency's regulatory definition of "waters of the United States" includes "intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce". 40 C.F.R. § 230.3(s)(3). *Hoffman Homes, Inc. v. Administrator, EPA,* 999 F.2d 256, 260–61 (7th Cir.1993), concluded that the EPA did not exceed its power when promulgating this definition but that even a rule with such broad scope did not cover a one-acre wetland 750 feet from a small creek. A six-acre retention pond, farther from a body of surface water, is an easier case. The EPA's definition speaks of "natural ponds"; Dayton Hudson built an artificial pond.

What of the possibility that water from the pond will enter the local ground waters, and thence underground aquifers that feed lakes and streams that are part of the "waters of the United States"? Justice Story's bucket was part of the navigable waters in this sense. We know from *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), that wheat a farmer bakes into bread and eats at home is part of "interstate commerce" because these activities affect the volume of interstate shipments. On a similar rationale all ground waters *could* be thought within the power of the national government. *Inland Steel Co. v. EPA,* 901 F.2d 1419, 1422 (7th Cir.1990) (reserving the question). But the Clean Water Act does not attempt to assert national power to the fullest. "Waters *of the United States*" must be a subset of "water"; otherwise why insert the qualifying clause in the statute? (No one suggests that the function of this phrase is to distinguish domestic waters from those of Canada or Mexico.) Neither the Clean Water Act nor the EPA's definition asserts authority over ground waters, just because these may be hydrologically connected with surface waters.

The omission of ground waters from the regulations is not an oversight. Members of Congress have proposed adding ground waters to the scope of the Clean Water Act, but these proposals have been defeated, and the EPA evidently has decided not to wade in on its own. The most concerted effort in Congress occurred in 1972, and the Senate Committee on Public Works explained why it had not accepted these proposals:

> Several bills pending before the Committee provided authority to establish Federally approved standards for groundwaters which permeate rock, soil, and other subsurface formations. Because the jurisdiction regarding groundwaters is so complex and varied from State to State, the Committee did not adopt this recommendation.

S.Rep. No. 414, 92d Cong., 1st Sess. 73 (1972). See also *Exxon Corp. v. Train,* 554 F.2d 1310, 1325–29 (5th Cir.1977) (recounting this history). In other words, Congress elected to leave the subject to state law—and Wisconsin has elected to permit Target Stores to build a warehouse that will affect the local ground waters.

Decisions not to enact proposed legislation are not conclusive on the meaning of the text actually enacted. Laws sometimes surprise their authors. But we are confident that the statute Congress enacted excludes *some* waters, and ground waters are a logical candidate. Two courts have held that ground waters are not part of the (statutory) "waters of the United States." *Exxon; Kelley v. United States,* 618 F.Supp. 1103 (W.D.Mich. 1985). The possibility of a hydrological connection cannot be denied, see *Sierra Club v. Colorado Refining Co.,* 838 F.Supp. 1428 (D.Colo.1993); *McClellan Ecological Seepage Situation v. Cheney,* 763 F.Supp. 431, 437 (E.D.Cal.1989), but neither the statute nor the regulations makes such a possibility a sufficient ground of regulation. On several occasions the EPA has noted the potential connection between ground waters and surface waters, but it has left the regulatory definition alone. E.g., Preamble to NPDES

Permit Application Regulations for Storm Water Discharges, 55 Fed.Reg. 47990, 47997 (Nov. 16, 1990) ("[T]his rule-making only addresses discharges to waters of the United States, consequently discharges to ground waters are not covered by this rulemaking (unless there is a hydrological connection between the ground water and a nearby surface water body.")) Collateral reference to a problem is not a satisfactory substitute for focused attention in rule-making or adjudication. By amending its regulations, the EPA could pose a harder question. As the statute and regulations stand, however, the federal government has not asserted a claim of authority over artificial ponds that drain into ground waters.

AFFIRMED.

MANION, Circuit Judge, concurring.

I agree with the court's holding that the plaintiff's claims invoking the Clean Air Act and the Clean Water Act should fail. For whatever reason the Village of Oconomowoc Lake wishes the warehouse would disappear (be it political, environmental, or simple resentment because it doesn't get a bite at the tax base), the regulations under the Clean Air and Clean Water Acts do not facilitate the attack. In addition, I would not speculate how to characterize a citizen's suit under § 7604(a)(1). Before federal courts begin deciding under the Clean Air Act whether or not such things as shopping malls are permissible because of their side effects, we should ensure that Congress has specifically authorized the EPA to regulate at that level. Nor would I suggest that the EPA can figuratively "wade in" to ground water as part of the waters of the United States without first having specific direction from Congress to do so. This would take more than a simple amendment of regulations by the administrators at the EPA. Regulations are promulgated at the direction of Congress, and at this juncture, Congress has not permitted collateral attacks against parking lots, septic tanks, and sprinkler systems—the natural consequence if we were to approve the interpretation espoused by the plaintiffs.