WASHINGTON WILDERNESS COALITION, a Washington Corporation, Okanogan Highlands Alliance, a Washington corporation, and Atlantic States Legal Foundation, Inc., Plaintiffs,

v.

HECLA MINING COMPANY, a Delaware Corporation, Defendant.

No. CS–94–233–FVS.

United States District Court, E.D. Washington.

Oct. 21, 1994.

Michael D. Axline, Deborah N. Mailander, Western Environmental Law Center, Eugene, OR, Richard A. Smith, Seattle, WA, for plaintiffs Washington Wilderness Coalition, a Washington nonprofit corp., Okanogan Highlands Alliance, a Washington nonprofit corp., Atlantic States Legal Foundation, Inc., a New York nonprofit corp.

Jerry K. Boyd, Paine Hamblen Brooke Coffin Miller, B. Mark Hausman, Paine Hamblen Coffin & Hampton, Spokane, WA, Mark Wielga, Elizabeth H. Temkin, Scott W. Hardt, Ballard Spahr Andrews & Ingersoll, Denver, CO, for defendant Hecla Min. Co., a Delaware corp.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' CAUSE OF ACTION UNDER THE CLEAN WATER ACT

VAN SICKLE, District Judge.

**BEFORE THE COURT** is Defendant's motion to Dismiss Plaintiffs' First Cause of Action, which arises under Section 301 of the Clean Water Act, 33 U.S.C. § 1311 ("CWA"). (Ct.Rec. 9). Plaintiffs are represented by Michael Axline, Deborah Mailander and local counsel Richard Smith; Mark Wielga, Eliza-

beth Temkin and local counsel B. Mark Hausman represent Defendant. Having reviewed the record and considered the arguments of counsel, the Court enters this Order to memorialize its ruling denying defendant's motion.

### Background

This case concerns Hecla Mining Company's Republic, Washington facility, which is a placer mine for gold and silver ore. In extracting gold and silver from ore, raw material is processed in a liquid solution containing cyanide and other chemical agents. This generates a significant amount of wastewater, which Hecla, pursuant to a state waste discharge permit[1], pumps from its mill into a 38 acre tailings impoundment ("Aspen Pond").

Plaintiffs' complaint alleges three sources of water pollution: (1) the Aspen Tailing Pond; (2) Tailing pond # 1; and (3) Tailing pond # 2. The Aspen Tailing Pond was allegedly constructed without an impermeable line. Plaintiffs allege that some chemicals and heavy metals bypass a water collection system installed by Hecla, and seep through the pond into waters of the United States.

Tailing ponds # 1 and # 2 are filled with dirt, and are no longer used in mining operations. Plaintiffs allege that inactive tailings in the ponds "seep and leach" contaminated waste water, some of which is intercepted and pumped into the Aspen pond, but some of which escapes and enters the waters of the United States.

In their first cause of action, Plaintiffs claim that Hecla is violating Section 301 of the CWA, by discharging pollutants into navigable waters without a National Pollutant Discharge Elimination System ("NPDES") permit. Plaintiffs' second cause of action, not the subject of the instant motion, is for CERCLA violations.

### Standards

Hecla moves to dismiss the CWA claim on two grounds: (1) lack of subject matter juris-

[1]. The state permit should not be confused with the NPDES permit required by the CWA for discharges from a point source into navigable waters. See 33 U.S.C. § 1342. The State permit merely authorizes Hecla to "discharge mill tail-

ings, seepage return, and mine drainage to the Aspen tailings impoundment", subject to certain effluent limitations. See permit, (Ct.Rec. 1, ex. C).

diction, and (2) failure to state a claim. Fed. R.Civ.P. 12(b)(1) & (6). In challenging subject matter jurisdiction, Hecla suggests that a citizens suit is not authorized under the CWA to enforce state water quality standards, which operate in lieu of federal standards in Washington. Hecla further questions the sufficiency of Plaintiffs' allegations of pollution from a "point source" into "navigable waters" of the United States.

When ruling on a motion to dismiss, whether for lack of subject matter jurisdiction or for failure to state a claim, the court accepts all factual allegations as true and draws all reasonable inferences in favor of Plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The complaint will not be dismissed unless it appears to a certainty that Plaintiffs can prove no set of facts which would entitle them to relief. *Elias v. Connett,* 908 F.2d 521 (9th Cir.1990).

*Discussion*

### 1. Subject Matter Jurisdiction.

Federal jurisdiction over citizens suits to enforce the CWA is grounded in Section 505, which authorizes private litigation "(1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a)(1). Hecla argues that Plaintiffs have not shown violation of an "effluent limitation", since they challenge Hecla's failure to obtain a limitation-setting permit in the first place. Hecla further asserts that citizens suits under the CWA are not authorized when a state NPDES permit process operates in lieu of the EPA-administered process.

■ Hecla's first argument has no support in the language of the CWA. Section 1365(f) defines "effluent limitation" to include "an unlawful act under subsection (a) of section 1311." Section 1311(a), in turn, makes it unlawful to discharge any pollutant except in compliance with the NPDES permit required in Section 1342. Thus, a citizens suit to enforce an "effluent limitation" can be based on allegations that the defendant is discharging without an NPDES permit. Plaintiffs cite several cases in which citizens have brought suit to require the issuance of a permit. *E.g. Sierra Club v. Abston Constr. Co., Inc.,* 620 F.2d 41 (5th Cir.1980); *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 370 (10th Cir.1979); *Hawaii's Thousand Friends v. Honolulu,* 806 F.Supp. 225, 229 (D.Hawaii 1992). The only court to address the question directly concluded: "obtaining a permit is itself an important effluent limitation, and private attorneys general may enforce that limitation via citizens suits." *Hudson River Fishermen's Ass'n v. Westchester Cty.,* 686 F.Supp. 1044, 1050 (S.D.N.Y.1988).

Hecla suggests that the Ninth Circuit would limit the scope of citizens suits to enforcement of permit limitations. *Citing Northwest Environmental Advocates (NWEA) v. Portland,* 11 F.3d 900 (9th Cir. 1993). In *NWEA,* the court noted that "effluent limitations" are "end-of-pipe limitations and permit violations", and that citizens suits are not authorized to establish general water quality standards. *Id.* at 908. The court did not suggest that a permit must be in place before a citizens suit may be brought; rather, it distinguished between suits to enforce discharge limitations that would be the subject of a permit and those to enforce general water quality standards. There is no question in this case that Plaintiffs' challenge is to discharge limitations subject to NPDES permit. This clearly falls within the jurisdictional sweep of the CWA.

■ Hecla's second argument is that the CWA does not provide jurisdiction for citizens suits when a state NPDES permit program operates in lieu of the federal program. This argument is based on 33 U.S.C. § 1342(c), which suspends the issuance of federal NPDES permits once a state permit program acceptable to EPA is in place. Washington has had an EPA-approved permit program since 1973. *See* 39 Fed.Reg. 26,061 (July 16, 1974).

The courts addressing whether citizens suits are available in a state with its own permit process are divided on the issue. Some hold that private suits are not authorized, on the theory that federal enforcement is suspended entirely by a state permit program. *E.g. City of Heath, Ohio v. Ashland Oil, Inc.,* 834 F.Supp. 971 (D.Ohio 1993) (no

citizen suit under similar RCRA state permit program) (citing *Dague v. City of Burlington*, 935 F.2d 1343, 1353 (2d Cir.1991)); *Thompson v. Thomas*, 680 F.Supp. 1 (D.D.C. 1987). These cases treat federal and state programs as separate universes, and conclude that citizens suits are authorized only under a state provision.

Other courts emphasize the unity of purpose behind state and federal CWA programs, and hold that citizens may enforce effluent limitations regardless of whether the EPA or a state agency issues the NPDES permits. *E.g. Lutz v. Chromatex, Inc.*, 725 F.Supp. 258, 261 (M.D.Pa.1989); *United States v. Hooker Chem. & Plastics*, 749 F.2d 968 (2d Cir.1984); *McClellan Ecological Seepage Situation ("MESS") v. Weinberger*, 707 F.Supp. 1182, 1190–91 (E.D.Cal.1988). This conclusion is suggested by the definition of "effluent limitation" in section 1362(11), which includes "any restriction established by a state or the [EPA] Administrator."

With respect to identical state enforcement provisions of the Resource Conservation and Recovery Act ("RCRA"), the EPA itself has taken the position that citizen's suits may be brought in states that have received authority to operate permit programs in lieu of the federal program. *Lutz v. Chromatex, Inc.*, 725 F.Supp. 258, 261 (M.D.Pa.1989) (citing EPA statement in 45 Fed.Reg. 85016 (Dec. 24, 1980)). *MESS* points out that state permit programs are essentially part of federal law, since they must be approved by the EPA, and must comport with stringent federal requirements. 707 F.Supp. at 1190–91; *see also*, 40 C.F.R. § 122.1 *et seq.* (setting forth program criteria for NPDES permits, applicable to both EPA and state administered programs). Several mandatory federal standards are expressly recognized as "effluent limitations" in the citizens suit provision of the CWA. 33 U.S.C. § 1365(f) (referencing standards in 33 U.S.C. §§ 1311, 1312, 1316, 1317, 1343; 33 U.S.C. § 1342(b)(1)(A)).

Hecla asserts that the state program for issuance of NPDES permits is intended to supplant all other methods of CWA enforcement. The court is not persuaded. Section 1342(c), which suspends the federal permit program upon approval of a state program, simply guarantees that the state will be the sole entity issuing NPDES permits. The EPA retains full authority to carry out its other duties under the CWA, and to supervise state programs to ensure compliance with federal guidelines. As to private action, the CWA generally authorizes citizens suits unless the responsible government agency has commenced proceedings for the same purpose; in that case, citizens are guaranteed a right to intervene in the government action. *See Hooker Chemicals*, 749 F.2d at 978; 40 C.F.R. § 25.1 *et seq.*

Nothing in the language or structure of the CWA suggests that citizens suits are incompatible with state administration of the NPDES permit program. Indeed, it would be bad policy to remove a key component of private enforcement from the CWA simply because the EPA has approved a state permit program in lieu of the federal bureaucracy. Accordingly, the court is persuaded by the line of authority holding that citizens suits may proceed in states administering their own NPDES permit program. Hecla's motion to dismiss for lack of subject matter jurisdiction is denied.

### 2. *Failure to State a Claim.*

The CWA makes it unlawful for any person or entity to "discharge any pollutant" without an NPDES permit. 33 U.S.C. § 1311(a) & § 1342(a). "Discharge of any pollutant" is defined as "any addition of any pollutant to **navigable waters** from a **point source**." 33 U.S.C. § 1362(12)(A) (emphasis added). Hecla argues that plaintiffs have not stated a claim under the CWA, because the mining runoff at issue does not flow from a "point source", and does not enter "navigable waters."

### (a) **"Point Source."**

Section 1362(14) defines "point source" as:

any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

A nonpoint source is anything else. *Idaho v. Hanna Mining Co.*, 699 F.Supp. 827, 832 (D.Id.1987), *aff'd*, 882 F.2d 392 (1988).

Hecla argues that its tailings ponds are not point sources, but merely "areas of low topography into which mine tailing from mineral processing activities have been deposited and through which water may percolate." (△'s memo at 13). Noting that a point source is usually a pipe or a ditch, Hecla points out that here we are dealing here with a 38 acre man-made pond.

■ Initially, it is clear that the size of the pond is not relevant to determining whether or not it is a point source. As plaintiffs explain, it would be irrational to conclude that the bigger the source of pollution, the less likely it is to be a "source" under the CWA. Cases cited by defendants' support the conclusion that man-made ponds, designed to receive tailings, are "conveyances" or "containers" under the definitions in the clean water act. *See United States v. Earth Sciences, Inc.*, 599 F.2d 368, 370 (10th Cir. 1979) (system of sump pumps, ditches, and hoses is "point source"); *Appalachian Power Co. v. Train*, 545 F.2d 1351, 1373 (4th Cir. 1976) (distinguishing point sources from "unchanneled and uncollected surface waters"); *Consolidated Coal Co. v. Costle*, 604 F.2d 239, 249 (4th Cir.1979) (point sources include slurry ponds, drainage ponds, and coal refuse piles); *Trustees for Alaska v. E.P.A.*, 749 F.2d 549, 557–58 (9th Cir.1984) (adopting *Earth Sciences* interpretation of point source to apply to placer mine). To similar effect is *Abston Constr.*, where the Fifth Circuit noted: "gravity flow (from rain or runoff water) ... may be part of a point source discharge if the miner at least initially collected or channeled the water and other materials"). *Sierra Club v. Abston Const. Co.*, 620 F.2d 41 (5th Cir.1980); *see also, Committee to Save Mokelumne River v. East Bay Util.*, 13 F.3d 305, 308 (9th Cir.1993) (holding that an NPDES permit is required for "surface run-

off that is collected or channelled" into a Mine Run Dam Reservoir).

■ These cases make clear that the touchstone for finding a point source is the ability to identify a discrete facility from which pollutants have escaped. Particularly persuasive is the reasoning of the *Earth Sciences* court, adopted by the Ninth Circuit in *Trustees for Alaska*. 599 F.2d at 370 [2]. There, the court noted that "point source" must be interpreted broadly to effectuate the remedial purposes of the CWA. 599 F.2d at 373. The non-point source designation is limited to uncollected runoff water from, for example, oil and gasoline on a highway, which is difficult to ascribe to a single polluter. *Trustees for Alaska*, 749 F.2d at 558. Discharges from a pond or refuse pile can easily be traced to their source. Thus, even though runoff may be caused by rainfall or snow melt percolating through a pond or refuse pile, the discharge is from a point source because the pond or pile acts to collect and channel contaminated water. *Id.* at 374.

■ It appears that EPA agrees with the *Earth Sciences* analysis. The preamble to EPA's NPDES Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47990 (Nov. 16, 1990), states that the agency "intends to embrace the broadest possible definition of point source consistent with the legislative intent of the CWA." (See ¶'s opposition memo, appendix A at 3). Accordingly, the federal regulations define "discharge of a pollutant" to include "surface runoff which is collected or channeled by man." 40 C.F.R. 122.2. In a letter from EPA region VIII, "point source" is defined to include "any seeps coming from identifiable sources of pollution (i.e., mine workings, land application sites, ponds, pits, etc.). Defendants correctly note that the EPA statements from Region VIII are not authoritative. *See Village of Oconomowoc Lake v.*

---

2. Both *Earth Sciences* and *Trustees for Alaska* involved placer mining operations similar to Hecla's Republic facility. In *Earth Sciences*, unusually large spring runoffs caused an overflow of a sump pump system, resulting in discharges of pollutants into a nearby creek. In *Trustees for Alaska*, discharge water was released from a sluice box, which the Ninth Circuit concluded was a "confined channel" under the statutory definition of point source. Like the tailing ponds at Hecla's facility, sumps and sluice boxes are designed to gather the sodium cyanide-sodium hydroxide water solution used to extract gold and silver from ore.

*Dayton Hudson Corp.*, 24 F.3d 962 (7th Cir. 1994). Nonetheless, they are persuasive, as they reflect a view which was endorsed by the Ninth Circuit in *Trustees for Alaska.*

 Even if it is not certain that the ponds in this case are similar enough to those in other cases to constitute a point source under the CWA, dismissal would be premature. Several courts note that the question whether a discharge occurred from a point source is fact-laden; the court must consider evidence of the "precise nature" of the Defendant's facility. *See Abston Const. Co.*, 620 F.2d at 47; *Hanna Mining*, 699 F.Supp. at 832; *Concerned Area Residents v. Southview Farm*, 834 F.Supp. 1410, 1417 (W.D.N.Y.1993). Thus, at this stage in the proceedings, plaintiffs' allegations are sufficient to establish that Hecla's tailings ponds are point sources within the meaning of the CWA.

### (b) "Navigable Waters."

 Hecla next argues that Plaintiffs merely allege discharge to groundwater, which is not part of the "navigable waters" of the United States. In fact, the complaint does allege that polluted wastewater from the Hecla mine enters surface waters, including Eureka Creek and Mud Lake[3]. (Complaint at 7). The connection to groundwater is Plaintiffs' acknowledgement that a large volume of discharge "seeps and leaks" from the ponds into the soil and groundwater, and thereafter into the surface waters. Given this indirect path of discharge, the court must decide whether the Clean Water Act's prohibition of the discharge of any pollutant into "navigable waters" encompasses discharges which migrate through groundwater.

The Clean Water Act generously defines "navigable waters" as "waters of the United States." 33 U.S.C. § 1362(7). Given the Act's purpose to regulate as fully as possible all sources of water pollution, the Supreme Court recognized that "the term navigable is of little import." *United States v. Riverside*

*Bayview Homes, Inc.*, 474 U.S. 121, 133, 106 S.Ct. 455, 462, 88 L.Ed.2d 419 (1985). To the extent permitted under the Constitution, Congress intended "navigable waters" to embrace virtually "every creek, stream, river or body of water that in any way may affect interstate commerce." *Quivira Min. Co. v. E.P.A.*, 765 F.2d 126, 129 (10th Cir.1985); *accord Leslie Salt Co. v. Froehlke*, 578 F.2d 742, 755 (9th Cir.1978).

 Nonetheless, Congress did not intend to include isolated groundwater as part of the "navigable waters." The language and structure of the Act make this clear. First, the CWA consistently refers to "navigable waters **and** ground waters" in those portions of the Act dealing with EPA program development as well as the study of water pollution. *E.g.* 33 U.S.C. § 1252(a), § 1254(a)(5), & § 1256(e)(1). In the provisions for water quality standards and discharge permitting, on the other hand, only the phrase "navigable waters" is used. *E.g.* 33 U.S.C. § 1312(a), § 1342(a)(4). If the terms were synonymous, it would not be necessary for Congress to make distinct references to groundwater and navigable water.

More importantly, the legislative history of the CWA demonstrates that Congress did not intend that discharges to isolated groundwater be subject to permit requirements. The Report of the Senate Committee on Public Works that accompanied the bill stated:

> Because the jurisdiction regarding groundwaters is so complex and varied from State to State, the Committee did not adopt this recommendation [to approve groundwater standards]. The Committee recognizes the essential link between ground and surface waters and the artificial nature of any distinction.

S.Rep. No. 414, 92d Cong., 1st Sess. 73 (1971), U.S.Code Cong. & Admin.News 1972, pp. 3668, 3739, *reprinted in* 2 Congressional Research Service of the Library of Congress, *A Legislative History of the Water Pollution*

---

**3.** In a side-note, Plaintiffs also suggest that the tailings ponds themselves constitute "navigable waters." (¶'s brief at 11). This is wrong. The EPA definition of navigable waters includes only "natural" ponds, as opposed to manmade collec-

tion systems. Besides, it is illogical for plaintiffs to maintain that the tailings ponds can be both a "point source" of discharge and "navigable water." *See Oconomowoc Lake*, 24 F.2d at 963.

*Control Act Amendments of 1972*, 93d Cong., 1st Sess., at 1491 (Comm.Print 1973) (hereinafter "Leg.Hist."). Congress rejected an amendment offered by Senator Aspin to "bring groundwater into the subject of the bill." 118 Cong.Rec. 10,669 (1972), 1 Leg. Hist. 597. (*See* Remarks of Sen. Aspin). Congress's main concern was expressed by Representative Harsha: "We do not have the knowledge or the technology to devise water-quality standards for ground water; we do not as yet know how to do that." 1 Leg.Hist. 594 (remarks of Rep. Harsha).[4]

Guided by the legislative history, courts that have considered the issue agree that "waters of the United States" do not include "isolated/nontributary groundwater." *See, Exxon Corp. v. Train*, 554 F.2d 1310 (5th Cir.1977); *United States v. GAF Corp.*, 389 F.Supp. 1379 (S.D.Tx.1975). They are split, however, on the present question of whether tributary groundwater, which is naturally connected to surface water, is subject to CWA regulation.

On the one hand are published decisions which hold that Congress intended regulation of "discharges of pollutants that could affect surface waters of the United States." *McClellan (MESS)*, 707 F.Supp. at 1196; *Sierra Club v. Colorado Refining Co.*, 838 F.Supp. 1428 (D.Colo.1993) ("discharge of any pollutant into 'navigable waters' includes such discharge which reaches 'navigable waters' through groundwater"). On the other hand are those courts which conclude that the possibility of a hydrological connection between ground and surface waters is insufficient to justify CWA regulation. *Oconomowoc Lake*, 24 F.3d 962 (7th Cir.1994)[5]; *Kelley v. United States*, 618 F.Supp. 1103

(W.D.Mich.1985). One court, rather than sorting through the conflicting authorities, deferred to an agency interpretation excluding groundwater from coverage under the CWA. *Town of Norfolk v. Corps of Engineers*, 968 F.2d 1438, 1450 (1st Cir.1992).

After reviewing the authorities, this court comes down on the side of *MESS* and *Colorado Refining*. The logic of these cases is compelling: since the goal of the CWA is to protect the quality of surface waters, any pollutant which enters such waters, whether directly or through groundwater, is subject to regulation by NPDES permit. Applying effluent limitations to tributary groundwater does not change nature of CWA monitoring. As *MESS* explains, Plaintiffs must still demonstrate that pollutants from a point source affect surface waters of the United States. 707 F.Supp. at 1196. It is not sufficient to allege groundwater pollution, and then to assert a general hydrological connection between all waters. Rather, pollutants must be traced from their source to surface waters, in order to come within the purview of the CWA. *Id.*

This approach to groundwater pollution has been favorably acknowledged by EPA on at least one occasion. Preamble, NPDES Permit Regulations for Storm Water Discharges, 55 Fed.Reg. 47990, 47997 (Nov. 16, 1990). Citing to *MESS* and *Exxon*, EPA stated that rulemaking in 40 C.F.R. parts 122, 123, and 124, does not apply to groundwater, "unless there is a hydrological connection between the ground water and a nearby surface water body." *Id.* The court in *Oconomowoc Lake* dismissed the EPA statements as a "collateral reference to a prob-

---

4. Plaintiffs read too much into the comments of Representatives Clausen and Dingell during debate on the 1972 amendment. *See* 1 Leg.Hist. 590–92. While the comments reflect an understanding that the Aspin amendment would bring ground water within the "enforcement provisions relating to the standards" of the CWA, they do not draw a distinction, as plaintiffs suggest, between "enforcement standards" and "permitting." To the contrary, the Representatives opposed the amendment precisely because they understood it to extend to ground water "the types of controls that are required for navigable water." 1 Leg.Hist. 591. The Ninth Circuit recently recognized that a feature of the 1972 amendments was to shift the focus of the CWA away

from water quality enforcement standards toward permit limitations. *Northwest Environmental Advocates (NWEA)*, 11 F.3d at 909–10. Thus, it would be natural for the language of "enforcement standards" and of "permitting" to overlap.

5. Curiously, *Oconomowoc Lake* makes no reference to the Seventh Circuit decision in *United States Steel Corp. v. Train*, 556 F.2d 822, 852 (7th Cir.1977), which held that the EPA is authorized to regulate tributary groundwater, "at least when the regulation is undertaken in conjunction with limitations on the permittee's discharges into surface waters."

lem." 24 F.3d at 966. It appears to this court, however, that the preamble explains EPA's policy to require NPDES permits for discharges which may enter surface water via groundwater, as well as those that enter directly.

Plaintiffs' complaint alleges a hydrological connection between seepage into groundwater and the nearby surface waters of Eureka creek and Mud lake. Taking the allegation as true, the complaint is thus sufficient to support a claim under the CWA.

*Conclusion*

Hecla's Motion to Dismiss must be denied. The Court has subject matter jurisdiction over citizens suits to require issuance of a NPDES permit through state CWA administration. The tailings ponds are "point sources", since they collect and channel contaminated water into a discrete conveyance. Plaintiffs allege discharge into "navigable waters", by describing pollution which migrates from ground waters beneath the tailings ponds into surface waters of the United States.

**IT IS HEREBY ORDERED:** Defendant's Motion to Dismiss Plaintiffs' First Cause of Action (Ct.Rec. 9) is **DENIED.**

**IT IS SO ORDERED.**